## CHARLESTON.

MAYER *v.* FROBE *et al.*

Submitted September 11, 1894—Decided March 27, 1895.

1. DAMAGES—EXEMPLARY DAMAGES.

   The common-law definition of the term "exemplary damages" is damages inflicted by way of punishment upon a wrongdoer as

a warning to him and others to prevent a repetition or commission of similar wrongs.

2. DAMAGES—EXEMPLARY DAMAGES.

The term "exemplary damages," in section twenty of chapter twenty nine, Acts of 1887, is used according to its common-law definition, and can not be otherwise construed without extrajudicial interference with a plain legislative enactment.

3. DAMAGES—EXEMPLARY DAMAGES.

The first and second point of the syllabus of *Pegram* v. *Stortz*, 31 W. Va., 220 (6 S. E. Rep. 485), and the first point of the syllabus of *Beck* v. *Thompson* 31 W., Va. 459 (7 S. E. Rep. 447) in so far as they hold that exemplary damages, in a proper case, can not be inflicted by way of punishment in a civil suit upon a wrongdoer, are hereby disapproved and overruled.

4. DAMAGES—EXEMPARY DAMAGES—TORTS.

In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

B. B. DOVENER for plaintiff in error.

W. W. ARNETT and ERSKINE & ALLISON for defendant in error, cited 31 W. Va. 220, 337; Acts 1877, c. 107, s. 16; Acts, 1887, c. 29, s. 20; 31 W. Va. 353; Acts, 1891, c. 100; 2 Am. & Eng. Enc. Law, 220; 26 W. Va. 280; 37 W. Va. 610; Acts 1887, c. 29, ss. 16, 20; 31 W. Va. 340, 341.

DENT, JUDGE:

Nancy C. Mayer plaintiff, on the 23d day of May, 1893, instituted her suit in the Circuit Court of Ohio county against George A. Frobe & Son to recover damages for the unlawful sales of intoxicating liquor to her husband, Carl Mayer, by which she was injured in her means of support, which resulted in a judgment for seven hundred and fifty dollars upon a verdict of a jury.

From this judgment the surviving defendant obtained a writ of error, and relies on the following assignment:

"*First.* The court erred in overruling defendant's demurrer to plaintiff's declaration.

"*Second.* The court erred in refusing to set aside the ver-

dict of the jury, and to grant a new trial. (See defendant's bill of exceptions No. 1).

"*Third.* The court erred in giving, at the request of the plaintiff, her instructions numbered, respectively 1 and 2, as set out in the defendant's bill of exceptions No. 2.

"*Fourth.* The court erred in refusing to give, at the request of the defendant, his instructions numbered 1 and 2, as set out in defendant's bill of exceptions No. 3.

"*Fifth.* The court erred in refusing to give, as requested, instructions to the jury, for defendant, numbered respectively, 3 and 4, and in giving modifications of same, as set out in defendant's bill of exceptions No. 4.

"*Sixth.* The court erred in allowing and permitting testimony, as well as refusing to permit certain testimony, to be given to, heard, and considered by the jury, as shown and set out in defendant's bills of exceptions numbered 1, 5, 6, 7, 8, and 9, respectively. And for other reasons apparent on the face of the record."

The first assignment appears to be waived in the argument, and, as there is no essential omission or defect of form in the declaration, the demurrer thereto was properly overruled. Nine bills of exceptions appear in the record, while the orders of the court only refer to and note the filing of one. It is a *stare decisis* rule of this Court that a bill of exceptions copied into the record, when there is no order filing the same, is not a true part of the record, and will not be considered. *Pegram* v. *Stortz,* 31 W. Va. 220 (6 S. E. Rep. 485) and authorities there cited. Hence eight of these bills of exceptions must be disregarded, while the first, and the only one which can be presumed to be a part of the record, is defective, in that the evidence is not incorporated in it. Elliott, App. Proc. §§ 821, 822. As to the eight extra bills of exceptions, it it sufficient to say that all the matters therein contained, or questions thereby raised, which are not purely technical and trivial, are included in a motion for a new trial; and in determining this the law must settle all or any of the questions raised as to any prejudicial ruling of the Circuit Court in so far as the defendant is concerned, and for this reason the failure to have his bills of exceptions properly made a part of the

record will not prevent a fair determination of the case, the defects in the bill filed being overlooked, that the important questions of law raised thereby may be judicially determined and settled. Among the defects pointed out and not here passed upon is the failure to designate specifically the grounds relied on in the motion for a new trial. *Gregory's Adm'r v. Railroad Co.*, 37 W. Va. 610 (16 S. E. Rep. 819); Elliott, App. Proc. §§ 827-895, inclusive.

Proceeding with the examination of the merits of this case, at the very threshold of its investigation, the question presents itself for determination whether this Court, as to the matter of exemplary damages will be controlled by the case of *Pegram v. Stortz*, 31 W. Va. 220 (6 S. E. Rep. 485) followed by *Beck v. Thompson*, 31 W. Va. 459 (7 S. E. Rep. 447) or will be governed by the law as settled beyond controversy by the great bulk of English and American authorities, including the supreme court of the United States. In the eighth edition of Sedgwick on Damages, revised and issued since the case of *Pegram v. Stortz*, the law is stated as follows, to wit: "In actions of tort, when gross fraud, malice, or oppression appears, the jury are not bound to adhere to the strict line of compensation, but may, by a severer verdict, at once impose a punishment on the defendant, and hold him up as an example to the community." 1 Sedg. Dam. (8th Ed.) § 347. "Considered as strictly punitory, the damages are for the punishment of the private tort, not for the public crime." *Id.* § 353. "Upon the whole the doctrine is to be supported (except in those few jurisdictions which have repudiated it) mainly on the grounds of authority and convenience." *Id.* § 354. The true doctrine on the subject, succinctly stated, and which should be generally received and strictly adhered to, is contained in the opinion of Justice Gray in the case of *Railway Co. v. Prentice*, decided Jan. 3, 1893, and reported in 147 U. S. 101 (13 Sup. Ct. 261): "In this Court the doctrine is well settled that in actions of tort the jury, in addition to the sum awarded by way of compensation for the plaintiff's injury, may award exemplary, punitive, or vindictive damages, sometimes called 'smart money,' if the defendant has acted wantonly or oppressively, or with such malice

as implies a spirit of mischief or criminal indifference to civil obligations. But such guilty intention on the part of the defendant is required in order to charge him with exemplary or punitive damages." *The Amiable Nancy*, 3 Wheat. 546, 558, 559; *Day* v. *Woodworth*, 13 How. 363, 371; *Railroad Co.* v. *Quigley*, 21 How. 202, 213, 214; *Railway Co.* v. *Ames*, 91 U. S. 489, 493, 495; *Railway Co.* v. *Humes*, 115 U. S. 512, 521 (6 Sup. Ct. 110); *Barry* v. *Edmunds*, 116 U. S. 550, 562, 563 (6 Sup. Ct. 501); *Railway* v. *Harris*, 122 U. S. 597, 609, 610 (7 Sup. Ct. 1286; *Railway Co.* v. *Beckwith*, 129 U. S. 26, 36 (9 Sup. Ct. 207). "Exemplary or punitive damages being awarded not by way of compensation to the sufferer, but by way of punishment of the offender and as a warning to others."

In the well considered case of *Pegram* v. *Stortz* the Supreme Court of this State, instead of following the hard-beaten path as clearly indicated by the decided weight of authority reaching beyond the memory of man into an unsearchable antiquity, and seeking to discover the underlying reason thereof, because the law appeared to their minds illogical, heroically assumed the responsibility, and endeavored to dam up the vast, increasing stream of judicial opinion, and turn it into a new and untried channel. But this attempt, however meritorious, has utterly failed of its purpose beyond our own borders, and within it has only served to produce perplexity and confusion, without any benefit, public or private, except to protect lawbreakers and wrongdoers from the just consequences of their illegal and wrongful acts.

Judge Green, in his lengthy opinion, concurred in by his associates, in line with the arguments of other dissenters from the established doctrine, relies on three principal objections to show that the doctrine of exemplary or punitive damages as received and acted on by the vast majority of judicial tribunals of last resort was opposed to reason, and therefore illogical and unjustifiable: *First*, That the form of the writ, excluding the very idea of punishment, does not justify or permit the recovery of any damages other than compensatory; *Second*, that to allow the assessment of punitive damages in a civil suit is unconstitutional, in that it per-

mits a defendant to be punished twice for the same offense; *Third,* that it is unjust to inflict a pecuniary punishment on a defendant, and donate it to the plaintiff instead of the state; there being no good reason, as he maintains, in allowing the plaintiff anything beyond a just compensation for injuries sustained, including mental anguish.

The first objection is technical, trivial, and wholly untenable; for the writ covers, and the plaintiff sues for all such damages as the law may award. Be they compensatory or punitive or both, they are his legal damages. Blackstone defines "damages" to be "a compensation and satisfaction for an injury sustained." 2 Bl. Comm. 438. A very ancient rule permitted a plaintiff to fix the amount of damages that would satisfy him for the wrong done. 1 Sedg. Dam. § 23. In almost all actions for a willful or wanton wrong to person, property or reputation it is more a question of satisfaction than of compensation that is sought; and satisfaction consist in visiting on the tort feasor a punishment fully adequate to the personal injury inflicted by him, vindictive in its nature, and without regard to compensation. The man whose reputation has been vilified, whose child has been seduced from the paths of virtue by a scheming libertine, and his home and happiness wrecked, or who has endured public contumely, gross insult, or unprovoked abuse, appeals not to the law for compensation for his blighted reputation, his wrecked home, or his dishonored life, for that the law can never give, but he demands that the slanderer, the abuser, the vilifier, and the seducer shall be punished in proportion to his wanton, wicked or malicious conduct. In actions *ex contractu,* or mere thoughtless trespass, or of mistaken legal right, compensation is sought; but in actions of malicious wrong it is the satisfaction of punishment that is demanded. And the jurist, however able, who sees in a money compensation a balm for every wrong, however heinous, suffered, and who would limit the relief sought in such cases to the mere mercenary consideration of dollars and cents as a compensation, but adds to the injury already endured. The establishment of such a rule as law will drive many an honorable and sensi-

tive man out of the courts of justice, to become the vindicator of his own honor, and the avenger of his own wrong.

The second objection is equally untenable. There is no constitutional inhibition against a pecuniary punishment twice for the same offense, but the provision of the constitution is that "no person shall be put in jeopardy of life or liberty twice for the same offense." Judge Green, in construing this provision in the case of *Fountain* v. *Town of Moundsville*, 27 W. Va. 192, says: "Under our constitution it is clear that any one accused of a felony or misdemeanor or of a statutory crime which may be punished by imprisonment is entitled to the protection of this provision; and it is equally clear that no one accused of a statutory crime, the only punishment of which is a pecuniary fine, can claim the benefit of this provision; and therefore, as this crime is not punished by imprisonment, the same offense may, if the legislature authorize it, be punished by imprisonment as well as by fine, when committed in a municipal corporation." And the court proceeds to hold that the same overt act may be punished twice, once as an offense against municipal ordinance, and once as a statutory crime, so long as life and liberty are not twice put in jeopardy. The same reasoning is of equal force and just as applicable in punishment in a civil action for a private injury. In such case the wrongdoer is neither tried, convicted nor punished for a crime against the public. Sometimes the law may hold the wrongdoer's act to be a crime, and inflict on him a penalty or fine in addition to the civil punishment; but this is for the offense committed by him against the public, and not for the private injury inflicted. But oftentimes a punishment is imposed in a civil proceeding for an act which is not punished or punishable as a crime. It is, however, certainly true beyond dispute that the legislature is alone clothed with the power to determine in either case in what manner and to what extent the malefactor shall be punished, and at the same time to authorize both civil and criminal punishment where life and liberty are not involved. In the case of *Railway Co.* v. *Humes*, 115 U. S. 523 (6 Sup. Ct. 110) the Supreme Court of the United States, by Justice Field, says: "The power of the state to impose fines

and penalties for a violation of its statutory requirements is coeval with government; and the mode in which they shall be enforced—whether at the suit of a private party or at the suit of the public—and what disposition shall be made of the amounts collected, are merely matters of legislative discretion." Admitting that the legislature has provided two ways of punishing an offender for the same offense, and in so doing it has exceeded its constitutional authority, yet, until the offender has been punished in one form, he can not plead it in bar of a proceeding in the other, for the object of the law is to punish the offender at least once, and not allow him to escape because he may be threatened with a double punishment. However this may be, it is plain that a wrongdoer may be punished in a civil action for the private injury inflicted by him, according to the willfulness of his act, to prevent a repetition of such wrongful acts on the part of himself and others; and such punishment is no bar to the infliction of a criminal punishment for the same act if it be a crime. Nor would this be a double punishment for the same offense, as in one case it would be punishment for an oppressive private wrong, and in the other for a wicked public crime. In the one case he is adjudged a criminal; in the other a wrongdoer. In the one case he is assessed with damages as a warning, and to prevent a repetition of wrongful conduct; in the other a penalty is imposed upon him for a crime committed.

The third and last objection is the most serious, but even it deserves not to be denounced as anomalous or illogical. The opponents of the doctrine of punitive damages, with a feeling of impregnability in the logic of their position, ask the question, why should the plaintiff, after having received a complete and adequate compensation for the injury received, be awarded a further sum as a mere punishment to the defendant? 1 Sedg. Dam. p. 517, answers this question as follows: "Many anomalies which have far less authority behind them must be supported on this ground, and no anomaly supported by both authority and convenience can be eradicated simply by showing it to be illogical. The idea that it is unjust rests upon the assumption that there is something unfair in allowing the plaintiff's damages to be

enhanced on account of the defendant's intent; but it is to
be said in reply to this that although the intent can not make
a wrongful act more wrongful, it may make the consequen-
ces of it much more serious, and of the extent of these con-
sequences the jury is the judge, and the only possible judge."
The Supreme Court of the United States answers the same
question as follows:  "The plaintiff is entitled to exemplary
damages, calculated to vindicate his right, and protect him
against future invasions."  *Barry* v. *Edmunds*, 116 U. S. 562
(6 Sup. Ct. 501).  Also: "If, in such cases where injuries to prop-
erty are committed, something beyond compensatory dam-
ages may be awarded to the owner by way of punishment
for the company's negligence, the legislature may fix the
amount, or prescribe the limit within which the jury may
exercise their discretion.  The additional damages being
by way of punishment, it is clear that the amount may be
thus fixed; and it is not a valid objection that the sufferer,
instead of the state receives them.  That is a matter on
which the company has nothing to say."  *Railway Co.* v.
*Humes*, cited above.  The law punishes the wrongdoer by a
forfeiture of his property in the shape of damages measured
by his evil intent.  That it bestows these damages on the
plaintiff is not a matter on which the defendant can com-
plain, although it may enhance the bitterness of his punish-
ment.

But there is still, in my humble opinion—in which the
Court does not unite—a more valid, ancient, and sacred rea-
son for the assessment of exemplary damages than those
usually given, having for its object the suppression or pre-
vention of all wrong, and the extermination of the desire
or motive to commit wrong; and this is that the common-
law is not agnostical, atheistical, nor even deistical, but is
unswervingly theistical.  As its crowning glory and chief
excellence, with faith immovable it believes in the God of
Moses, "who, watching over Israel, slumbers not, nor sleeps."
Whatever atheistical or agnostical tendencies may have
prevailed from time to time, no act repealing or abrogating,
or even derogatory or repugnant to this fundamental prin-
ciple of the common-law has ever been knowingly enacted

by the legislatures of this or the state of Virginia. The great English commentator on the common-law, known and honored by all jurists, speaking of the weakness of human reason corrupted by passion and prejudiced and impaired by disease and intemperance, says: "This has given manifold occasions for the benign interposition of Divine Providence, which, in compassion to the frailty, the imperfection, and the blindness of human reason, hath been pleased at sundry times and in divers manners to discover and enforce its laws by an immediate and direct revelation. The doctrines thus discovered we call the 'revealed' or 'divine' law, and they are to be found only in the Holy Scriptures. These precepts, when revealed, are found upon comparison to be really a part of the original law of nature, as they tend in all their consequences to man's felicity. But we are not from thence to conclude that the knowledge of these truths was attainable by reason in its present corrupted state, since we find that until they were revealed they were hid from the wisdom of ages. As, then, the moral precepts of this law are, indeed, of the same original with those of the law of nature, so their intrinsic obligation is of equal strength and perpetuity. Yet, undoubtedly, the revealed law is of infinitely more authenticity than that moral system, which is framed by ethical writers and denominated the 'natural' law, because one is the law of nature, expressly declared so to be by God himself; the other is only what by the assistance of human reason, we imagine to be that law. If we could be as certain of the latter as of the former, both would have an equal authority, but till then they can never be put in competition." 1 Bl. Comm. 42.

The faithful servant of God, whose equal, save One, has never appeared in human form, in transmitting from the infinite to the finite that perfect code of laws known as the "Ten Commandments," which challenges the admiration and obedience of all mankind as the sure foundation of peace, prosperity and happiness, also at the same time, as from the same divine source, delivered with a tongue that forbade the utterance of any untruth, the following, among other judgments for the government of his people: (1) "If

a man shall dig a pit, and not cover it, and an ox or an ass shall fall therein, the owner of the pit shall make it good." (2) "For all manner of trespass, whether it be for ox, for ass for sheep, for raiment, or for any manner of lost thing, which another challengeth to be his, the cause of both parties shall come before the judges, and whom the judges shall condemn, he shall pay double unto his neighbor." (3.) "If a man shall steal an ox or a sheep, or kill it, or sell it, he shall restore five oxen for an ox and four sheep for a sheep." Exodus, c. 22. In these judgments the principle of punitive damages assessed in proportion to the evil intent of the wrongdoer is declared established, and enforced for the benefit of the injured party, and, in addition thereto, the offender had to make atonement for his sin or crime by suitable sacrifices.

It being my firm conviction, derived from the wisest expounders thereof, that the early founders of the common-law were true believers in the Bible as a revelation from God, and from which they acquired its most solid and enduring principles, I have referred to the foregoing judgments, without any intention of binding my associates to the same opinion. Nor do I consider it a mere arbitrary rule prescribed by supreme authority, but it is founded on wisdom and justice, for the purpose of preventing, rather than punishing, wrong. It is universally recognized as an unequivocal truth that the greatest source of evil among men is a selfish disregard of the rights of others, the existence of which argumentatively makes civil government absolutely necessary for man's felicity. To overcome and destroy this selfishness by rewards and punishments after the manner or measure of Biblical justice, when properly enforced, this rule has proven itself invaluable. Its effect is fourfold in its operation. As to the wrongdoer it is a double-edged sword: *First.* It requires him to make full reparation. *Second.* It punishes him in proportion to the maliciousness of his conduct. As to the sufferer. *First.* Acting as his protector, it fully compensates him for his loss. *Second.* As his avenger, it rewards him, in proportion to the wicked spirit of his adversary, for the obedient sub-

mission of his cause to its arbitrament. And, when strictly enforced, it stands as a continual and ever present menace to evil doers.

In law, as well as in physics, an ounce of prevention is worth a pound of cure. When an evil disposed person is forewarned that the effect of his wrongful act will in no wise injure the object of his malice, but will increase his neighbor's estate, and enhance his neighbor's prosperity, at an expense to and loss of his own, in proportion to his oppressive and unlawful conduct, he will not only hesitate, but be deterred from doing a wrong injurious to himself alone, and beneficial to the sufferer from his ill will or evil conduct. His motive for evil is thus destroyed.

The question may be suggested, where did the early Saxon founders of the common-law obtain their knowledge of this rule? Long before the most ancient records of Saxon origin, the tribes of Israel, by reason of their disobedience, in fulfillment of the farewell prophecies of their great lawgiver, had been scattered "among all people, from the one end of the earth even unto the other," carrying with them the laws, precepts, and practices of their fathers, which they were commanded "to teach diligently unto their children." However this may be, truth is not a matter of locality. Wherever and whenever the human intellect, as the image of its maker, is uncorrupted by vice and immorality, uncontaminated by disease and intemperance; and unbiased by passion and prejudice, it perceives and seizes upon truth with an instinctive affection as a priceless possession bestowed by an all wise creator, and herein consists the "excellency of the common-law, which is said to be the perfection of human reason," and our system of trials by jury, having its foundation on the innate love of right and justice implanted in the breast of all men by infinite wisdom. An illustration of this is to be found in certain present provisions of our statutory law, which bear a marked resemblance to the ancient judgments cited above, and which it would be hardly safe to predicate on legislative imitation of the book of Exodus. Section 25, chapter 41, of the Code, provides that an officer who sells the exempt property of a

debtor shall forfeit and pay to him double the value thereof. Section 3, chapter 60, provides that for a simple trespass by any animal the owner shall pay compensatory damages; for a willful trespass, double; and, if allowed to continue, the trespassing animal is forfeited.   Chapter 92 of the Code provides that where simple waste is committed, damages, as a compensation, shall be awarded; but, where the waste is willful or wanton, three times the damages sustained may be awarded.   In these cases, and many others similar, punitive damages are awarded because of the willful, wanton, or unlawful conduct of the wrongdoer.   In the case of *Railway* v. *Humes*, before cited, the court says:   "The statutes of nearly every state in the Union provide for the increase of damages where the injury complained of results from the neglect of duties imposed for the better security of life and property, and make that increase in many cases double, in some cases treble, and even quadruple, the actual damages.   And experience favors this legislation as the most efficient mode of preventing with the least inconvenience the commission of such injuries.   The decisions of the highest courts have affirmed the validity of such legislation. The injury actually received is often so small that in many cases no effort would be made by the sufferer to obtain redress if the private interest were not supported by the imposition of punitive damages."   There can, therefore, be no other conclusion than that exemplary, punitive, or vindictive damages are sustained by authority, Biblical and human, and justified by reason and experience as the most efficient means that can be devised under divine sanction to prevent the commission of private injuries, and most effectually and completely punish the wrongdoer for the willful and unlawful invasion of his neighbor's rights, and preserve with the least inconvenience and expense the peace and good order of society.   The opposite doctrine, as maintained in the case of *Pegram* v. *Stortz*, directly contravenes this conclusion, and therefore does not propound the law.   Hence the duty, unpleasant though it be, devolves upon us of disapproving and correcting the palpable error into which the court was then led, and of returning to the beaten path of the "wis-

·dom of ages," from which there should be no future de-
parture.

· In the case of *Beck* v. *Thompson*, 31 W. Va. 459 (7 S. E.
Rep. 447) the court followed the decision in the case of
*Pegram* v. *Stortz*, and yet with no such disastrous conse-
·quences; for while it was held that exemplary damages
could not be recovered as a punishment to the defendant,
.yet they were allowed as a compensation for the mental an-
guish, shame and dishonor suffered by the injured party.
Sedgwick says (volume 1, § 354): "It should be observed,
in conclusion, that even in jurisdictions which discounte-
nance the doctrine (of punitive damages) juries are allowed to
give, under the title of 'damages to feelings,' verdicts quite
as substantial as any which could be recovered under the
head of 'exemplary damages.' Hence it is not open to the
·opponents of exemplary damages to contend that the prac-
tical results of the application of the rule work any injus-
tice, or that the rule bears more heavily upon the wrongdoer
than the substitute of which they are advocates. In either
·case it is the jury, and not the court, which practically de-
cides how much the plaintiff may recover." So in such
cases it becomes simply a distinction without a difference.
The jury, being unable to measure mental anguish, shame
and dishonor in dollars and cents, ascertains and fixes the
·damages at a sufficient sum, measured by the maliciousness
of the wrong, to adequately punish the wrongdoer; and the
·court, in sustaining the finding of the jury, determines that
the sum so found is a compensation given for mental an-
guish. The law, by this nothing less than absurd position
on the part of the administrators of justice, gains nothing,
but loses much of the wholesome influence it would other-
wise exert as a terror to evildoers and the avenger of its
zealous and confiding supporters. In the case of *Borland*
v. *Barrett*, 76 Va. 128—a case in all respects similar to *Beck*
v. *Thompson*—the correct rule is given as follows: "The
jury, in such case, may give not only such damages as they
think necessary to compensate the plaintiff, but also such
as will operate as a punishment to the defendant, and tend
.to deter him and others from similar outrages." The case

of *Beck* v. *Thompson*, therefore, while it did no harm, was decided under a misapprehension of the law, and, to the extent it follows a bad precedent, should be overruled. While apparently so at variance with each other, yet a reconcilia‧tion of these differences of opinion establishes the just rule of exemplary damages to be as follows: If, after the jury has assessed damages to fully compensate the plaintiff for the injury, such damages are still not sufficient in amount to punish the defendant for the maliciousness of the private wrong of which he is found guilty, and to hold him up as a public example and warning, to prevent the repetition of the same or the commission of similar wrongs, they may add such further sum, as may in their judgment, be nec‧essary for this purpose. But if the damages assessed as compensatory are sufficient in amount to operate at the same time as a punishment and a warning, the jury are not authorized to add still a further and greater sum, and thus subject the defendant to a double punishment in the same case for the same wrong. A single punishment for a single private wrong is what the law seeks, and, if an adequate compensation will accomplish that purpose, the damages should end there. Justice is not an aristocrat, and should not be made to wear kid gloves on its iron hands to hide from a wrongdoer the fact that he is being punished until he smarts for his malicious, reckless, wanton or fraudulent conduct.

In the case so much relied on by Judge Green, of *Riddle* v. *McGinnis*, 22 W. Va. 253, being an action for seduction of a daughter, the Court held: "The jury, in estimating the damages sustained by the plaintiff, may take into consideration the mental anguish, the dishonor, and shame endured by the plaintiff * * * by reason of the wrongful act of the defendant." This necessarily must include punitive damages, as the lesser is always included in the greater; for what will satisfy shame, dishonor, and mental anguish can not be less in amount than such sum as will amply operate as a punishment to the defendant, and a warning to others. It would be a poor father, indeed, that would be content with a less satisfaction; and juries are usually composed of

fathers and brothers. But there are many cases in which the punitive damages must exceed the compensatory, and this oftentimes by legislative enactment. In the case of *Pegram* v. *Stortz*, while the argument is based on the claim that exemplary or punitive damages, strictly speaking, are in violation of constitutional and fundamental law, and although it must be conceded that the legislature used the word "exemplary" according to its ordinary, accepted and legal meaning, yet the court avoids the decision of the law as unconstitutional by giving a new definition to the word "exemplary," wholly different from the ordinary and commonly accepted definition as given in all the standard authorities, text-books and dictionaries, and received and acted on by the vast majority of courts and legislatures. Webb, Pol. Torts 220, notes. This redefinition is that "exemplary" means "indeterminate" damages, not given by way of punishment, and making an example of the malefactor for the wanton wrong committed by him, but to satisfy wounded honor or feelings, and therefore what law writers usually include under the head of "compensatory" as distinguished from "punitive" damages. In doing so the court not only violated the ordinary rule of construction "that, where a word has a clear and settled meaning at common-law, it should be given the same meaning in construing a statute, but unintentionally invaded legislative functions, and, in effect, amended the statute in such way as to defeat the evident intent and purpose of its enactment. There might have been some excuse for this unjustifiable departure from precedent if it was sound law, as maintained, that the legislature was deprived by some provision of the constitution of the power to authorize the recovery of strictly exemplary or punitive damages in case it might deem such recovery proper. But this legislative power is beyond question. *Railway Co.* v. *Humes*, cited above. While the only benefit that has accrued to any one from this redefinition of the word "exemplary" has been the protection of the willful and deliberate law breaker from well merited punishment, it has had the effect to produce confusion and contradiction in the decisions of this Court, and to bring them

into disrepute as reliable authority. In the case of *Ricketts* v. *Railway Co.*, 33 W. Va. 434 (10 S. E. Rep. 801) this Court is compelled to return to the true common-law definition of the word "exemplary" as recognized and expounded in *Downey* v. *Railroad Co.*, 28 W. Va. 732; *Ogg* v. *Murdock*, 25 W. Va. 139; *Vinal* v. *Core*, 18 W. Va. 1; *Baker* v. *Sweeny*, 13 W. Va. 158; and numerous other of its decisions, where the true meaning of the word was never questioned. It will hardly be maintained that "exemplary," when it relates to the unlawful sale of intoxicating liquors, has a different legal meaning from its usual meaning when applied to any other wrongful act. Such a proposition is too absurd for argument, and Judge Green, in his elaborate opinion, makes no such pretense. The doctrine of exemplary damages, as promulgated for the first time in the case of *Pegram* v. *Stortz*, followed by *Beck* v. *Thompson*, being subversive of the common-law, and in contravention of former decisions of this Court, can not be regarded as *stare decisis*, and should be no obstacle in the way of a return to well founded principles supported by reason and justice, and upheld by authority and practice, to which the "memory of man runneth not to the contrary." Not only is this true as a privilege, but is incumbent as a duty, when by so doing the decisions of the court will be rescued from contradiction, obscurity and doubt, the legislative enactment sustained and vindicated in accordance with its true intent and meaning, and ends of justice attained and promoted. For this Court to take any other than a backward step in this matter to regain a correct position would be to plunge into further difficulties among a hopeless minority, blindly groping about in a mist of its own creation, avoiding the beacon lights of the past, and straying farther away from the point of its departure; thus rendering a return to the old landmarks impossible, except through legislative intervention declarative of the common-law. The creation of such a necessity should be avoided when possible.

Besides the courts of England and the Supreme Court of the United States, nearly every state supreme court has held the doctrine of exemplary damages strictly as a pun-

ishment to be the true common-law rule. 1 Sedg. Dam. § 360.
In construing an enactment of the legislature it is always
necessary to consider the cause for its existence, or the evil
to be remedied. Many good people believe that the sale
of intoxicating liquors is an evil in itself that should be pro-
hibited; others consider it a necessary evil that should be
regulated and licensed; while still another class regard it
a legitimate branch of business, subject to abuse, and nec-
essary to be surrounded with safeguards. All classes, ex-
cept the lawless, agree that the sale of intoxicating liquors
to a minor or an habitual drunkard is an evil in itself, and
oftentimes productive of great harm to innocent and de-
pendent persons in their property, persons and means of
support, and therefore should be absolutely prohibited. A
compromise of these various views originated in the present
license and local option law, with its penalties and forfeit-
ures, contained in chapter 29, Acts 1887, being the enact-
ment under which this suit was instituted. Section 16 of
the act provides: "If any person, having a state license to
sell spirituous liquors, wine, porter, ale, beer, or any other
intoxicating drink, shall sell or give any such liquors or
drinks to any minor or person of unsound mind or to any
person who is intoxicated at the time or who is in the habit
of drinking to intoxication, or if he permit any person to
drink to intoxication when he knows or has reason to be-
lieve such person is a minor or of unsound mind, or is in-
toxicated, or is in the habit of drinking to intoxication, on
any premises under his control, or sell or give any intoxi-
cating drink to any one on Sunday, he shall be guilty of a
misdemeanor and fined not less than twenty nor more than
one hundred dollars." And section 20 provides: "Every
husband, wife, child, parent, guardian, employer or other
person who shall be injured in person or property, or means
of support by any intoxicated person, or in consequence of
the intoxication, habitual or otherwise, of any person, shall
have a right of action in his or her name severally or jointly
against any person who shall by unlawfully selling or giv-
ing intoxicating liquors have caused the intoxication in whole
or in part of such person, and any person or persons owning,

renting, leasing or permitting the occupation of any building or premises and having knowledge that intoxicating liquors are to be sold therein, or having leased the same for other purposes shall knowingly permit therein the sale of any intoxicating liquors that have caused in whole or in part the intoxication of any person shall be liable severally and jointly with the person or persons selling or giving intoxicating liquors aforesaid for all damages sustained and for exemplary damages." By these sections the condition of dependence of one person on another is fully recognized, and a private right declared, the infringement of which becomes a private wrong, for which an action lies not only for compensatory, but exemplary, damages. This statute differs from the one under which the case of *Pegram* v. *Stortz* was decided, in that no notice of the lawbreaker is required before a civil suit can be instituted; hence much of the reasoning in that case has no bearing on this. The main question in both cases, however, is as to the legislative intention in the use of the word "exemplary." In that case Judge Green says: "The evident object of our statute was to recompense members of a family for certain losses sustained by the sale or furnishing of intoxicating liquors to a member of the family in violation of certain specified provisions of the statute, and it was not intended to punish the vendor of such intoxicating liquors." This is on the theory that the legislature understood before the enactment of the law what definition would be given by him to the word "exemplary," a matter of impossibility. But it is quite plain that the legislature had in contemplation the very ordinary and commonly accepted meaning of the word "exemplary," and it was their evident intention to provide both civil and criminal punishment for the willful lawbreaker, as the most effectual means to prevent the evils of intoxication or excessive drinking. *Bean* v. *Green*, 33 Ohio St. 451; *Rawlins* v. *Vidvard*, 34 Hun. 209. The wrong from which the injury results being criminally unlawful, is wanton, and therefore a proper case for the imposition of exemplary damages. The tendency of the earlier decisions in some states, when the legislation on the subject was new and untried, was to hold that aggra-

vating circumstances, in addition to the proof that the sale was unlawful and injurious, were necessary to be shown to justify the assessment of exemplary damages according to the common-law rule. *Franklin* v. *Schermerhorn*, 8 Hun. 115. But the later and better considered decisions are to the effect that where the sale is shown to be injurious to the plaintiff in person, property or means of support, the fact that it was knowingly made in direct violation of the statute, without any other aggravating circumstances, furnishes sufficient grounds for the imposition of exemplary damages. *Schnider* v. *Hosier*, 21 Ohio St. 98; *Bean* v. *Green*, 33 Ohio St. 444; *Davis* v. *Standish*, 26 Hun. 615; *Rawlins* v. *Vidvard*, 34 Hun. 209; *Weitz* v. *Ewen*, 50 Iowa 34; *Jockers* v. *Borgman*, 29 Kan. 110. Our legislature has so declared, and in so doing, not having exceeded its constitutional bounds, its enactment is beyond the pale of judicial interference. If the law is unwise or injudicious or operates too harshly or severely, the responsibility must rest with, and an appeal for relief must be to, the legislature, and not to the judiciary, who are powerless to alleviate the severity of any constitutional enactment.

In considering the motion for a new trial it is the well settled rule that the weight of the testimony is for the jury, and not for the court; and, unless the verdict is plainly contrary to the weight of the testimony, it will not be disturbed.

Thus viewing this case, the unlawful sales of intoxicating liquors injurious to the plaintiff's means of support are fully established. The husband had become an habitual drunkard, squandered all his property, and deserted his family, because of his intemperate habits, leaving the wife to support herself and children. The surviving defendant insists as a sole objection to the sufficiency of the evidence that no knowledge of the drinking habits of the husband was brought home to the defendants. There might have been some grounds for this objection had he not testified himself with regard thereto, and given as his reason for not selling the husband anything to drink that he knew his wife did not want him to have any, and knew the way he got when he was next door. Evidently the jury believed his admissions, and

gave him full credit therefor, but disbelieved and disregard-- ed his testimony denying the sales, concerning which he was contradicted by other witnesses in the case. There are various other circumstances shown in the evidence from which the jury could infer he had full knowledge of the drunken habits of the husband. Their verdict, being supported by evidence, can not be disturbed, although the court might have disagreed with their finding had they been on the jury.

As to what would be a proper amount to assess by way of punishment for the private wrong done to operate as a warning and prevent repetition of similar wrongs, many minds might well differ, and, the legislature not having seen proper to fix any limit, the jury become the sole and final judges, unless their finding evinces passion, prejudice, partiality or corruption; and the court can not invade their province. Under the law as applied to the circumstances of this case, seven hundred and fifty dollars is not an excessive verdict. *Battrell* v. *Railway Co.*, 34 W. Va. 232 (12 S. E. Rep. 699); *Borland* v. *Barrett*, 76 Va. 128.

The defendant might well insist that the punishment is severe; that if he had not made the sales complained of, others would have done so; and that the sale of intoxicants being a legitimate business, there were divers ways in which a person in the habit of drinking to intoxication could and would obtain the means to satisfy an uncontrollable thirst; and that he should not be made the scapegoat or sacrifice for the sins of others. The answer suggests itself that although the law licenses drinking as a source of revenue, it seeks to prevent and suppress intemperance, with its long line of attendant evils; and the legislature, with this end in view, has authorized the infliction of exemplary damages. That the spirit and manifest intention of the law is good, can not be denied; and if it could be made to effect the object of its originators it would confer upon society a boon of inestimable value; and, even though it should only succeed in diminishing to a limited extent the widespread sorrow, poverty and misery inflicted on the helpless and innocent by the wretched slaves of a depraved and vicious appetite, its enactment will not have been in vain. That it may prove-

entirely abortive is not a valid reason why the court should refuse to enforce or the defendant decline to obey it, although it might furnish a potent reason why the legislature should amend or repeal it.

There being no sufficient error to justify the reversal of the judgment of the Circuit Court, it is affirmed.

---

BRANNON, JUDGE:

Judges Holt, English and myself, lest we be misunderstood, conclude that a short note, to express our position, is called for in view of the opinion in this case. In consultation we suggested that we did not feel called upon, in a judicial opinion, to assert or deny any particular, distinctive Christian creed or dogma. Blackstone is referred to in the above opinion. He was writing law for a government in which church and state were united, a particular church and its creed being an integral part of that government; but it is our boast that ours is a government in which church and state are separated by the letter of our constitutions, by governmental adminstration, and by the sentiment of our people. In this land every one may worship and believe as his conscience and mind approve. Our government knows no distinctive Christian or other creed, merely as such, but grants absolute tolerance to all creeds and beliefs; and our population is composed of people of many different Christian denominations and of other creeds. As men and citizens they are equal before the law, the government and the public courts. The government is by all, for all, and of all the people. This Court is a part of that government. Its duty is to expound alike for all the municipal law of the land, and when it does that its function is performed. It is not its duty or prerogative to expound religious principles, or expressly or impliedly disparage any man's belief. While we, as individuals, have the highest regard and respect for Christianity generally, we do not think it proper, in an opinion of this Court, to appear to espouse or enforce any particular or distinctive Christian creed.