475 S.E.2d 122

**Larry E. ALKIRE, Appellant,**

v.

**FIRST NATIONAL BANK OF PARSONS, a National Banking Association, Appellee,**

v.

**MOSLER, INCORPORATED, a Delaware Corporation, Third–Party Defendant Below.**

**No. 23125.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 17, 1996.

Decided July 15, 1996.

RECHT, Justice.

The plaintiff, Larry E. Alkire, appeals an order of the Circuit Court of Tucker County, which vacated a jury verdict awarding him $1,050,000.00 in punitive damages. We find reversible error in the trial court's vacating that portion of the verdict that awarded punitive damages, and therefore, reverse that decision and remand this case for further proceedings consistent with this opinion.

## I.

### THE FACTS

In 1986, Mr. Alkire, a resident of Tucker County and a recent high school graduate, was employed by Parsons Texaco, owned by Russell and Joyce Shahan. One of Mr. Alkire's duties was to take the daily receipts from Parsons Texaco and Shop–N–Go (also owned by the Shahans) and deposit them in a night depository of the defendant, First National Bank of Parsons (hereinafter the Bank). On June 28, 1986, Mr. Alkire made a deposit consisting of two bags from Shop–N–Go and one bag from Parsons Texaco in the Bank's night depository. On the following day, the two Shop–N–Go bags were retrieved from the night depository, but the Parsons Texaco bag was not to be found. Consequently, the Parsons Texaco deposit was never logged into the Bank's records.

Approximately one month after the deposit, Mr. Alkire's employer became aware of the missing deposit. A criminal investigation ensued under the direction of the West Virginia State Police. Mr. Alkire became the target of the investigation upon suspicion that he stole the missing deposit. The investigation climaxed with the matter being presented to the Tucker County grand jury during its October 1986 term. The grand jury refused to charge Mr. Alkire with a crime by returning a non-true bill. *See* W. Va.Code 52–2–8 (1923);[1] W. Va. R.Crim.P. 6(f).[2]

James Paul Geary, Geary & Geary Petersburg, for Appellant.

David A. Sims, Debra Tedeschi Hall, Sims & Hall, Elkins, for Appellee.

1. W. Va.Code 52–2–8 (1923) provides:

   At least twelve of the grand jurors must concur in finding or making an indictment or presentment. They may make a presentment or find an indictment upon the information of two or more of their own body, and when a presentment or indictment is so made, or on the testimony of witnesses called on by the grand jury, or sent to it by the court, the names of the grand jurors giving the information, or of the witnesses, shall be written at the foot of the presentment or indictment.

2. W. Va. R.Crim.P. 6(f) provides:

   An indictment may be found only upon the concurrence of 12 or more jurors. The indictment shall be returned by the grand jury to a circuit judge in open court. If a complaint is

The grand jury's refusal to formally charge Mr. Alkire with a crime did little to extinguish the shadow of suspicion surrounding him among the citizens of Parsons. The uncertainty as to Mr. Alkire's involvement in the missing deposit made life difficult for Mr. Alkire to the extent that he felt shunned in the community, feeling more "at ease away from Tucker County than ... in Tucker County." The resulting slights, ridicule, embarrassment, and shame became manifest to the point that, according to Mr. Alkire's mother, he suffered a complete personality change.

Nearly two and one-half years after the deposit was lost, the Bank, by sheer fortuity, discovered the deposit lodged in the recesses of the night depository. Despite locating the lost deposit, the Bank chose not to inform Mr. Alkire of this discovery because, according to the Bank, Mr. Alkire was not the customer whose deposit was missing. Mr. Alkire eventually learned of the recovery of the deposit through an anonymous telephone call on or about April 18, 1989, approximately six weeks after the deposit was recovered.

This civil action was filed by Mr. Alkire alleging the Bank's negligence, gross negli-

gence and fraud. The complaint demanded relief in the form of both compensatory and punitive damages. The Bank impleaded Mosler, Inc., the manufacturer of the night depository,[3] contending that any negligence in the construction, installation, and/or maintenance of the night depository, which was the proximate cause of Mr. Alkire's injuries, was attributable solely to Mosler. Following a jury trial, a verdict was returned in favor of Mr. Alkire in the amount of $210,000 in the form of compensatory damages and $1,050,000 in the form of punitive damages. The jury found the Bank to be the only party at fault, with no culpability being found on the part of Mr. Alkire or Mosler, Inc.

## II.

### POST–TRIAL MOTIONS

The Bank filed post-trial motions, including: (1) a motion for a judgment notwithstanding the verdict pursuant to West Virginia Rules of Civil Procedure 50(b);[4] (2) a motion for a new trial pursuant to West Virginia Rules of Civil Procedure 59(a);[5] and (3) a motion for a reduction in the amount of

pending against the defendant and 12 jurors do not concur in finding an indictment, the foreperson shall so report to the circuit judge in writing forthwith.

**3.** W. Va. R. Civ. P. 14(a) provides, in pertinent part:

At any time after commencement of the action a defending party, as a third-party plaintiff, may cause a summons and complaint to be served upon a person not a party to the action who is or may be liable to him for all or part of the plaintiff's claim against him.

**4.** W. Va. R. Civ. P. 50(b) provides:

Whenever a motion for a directed verdict made at the close of all the evidence is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed

verdict. A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned the court may allow the judgment to stand or may reopen the judgment and either order a new trial or direct the entry of judgment as if the requested verdict had been directed. If no verdict was returned the court may direct the entry of judgment as if the requested verdict had been directed or may order a new trial.

**5.** W. Va. R. Civ. P. 59(a) provides:

A new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law; and (2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity. On a motion for a new trial in an action tried without a jury, the court may open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new findings and conclusions, and direct the entry of a new judgment.

the punitive damage award pursuant to West Virginia Rules of Civil Procedure 59(e) (remittitur).[6]

The trial court denied all of the post-trial motions, except the motion which opposed the punitive damage award. The trial court reasoned that there was insufficient evidence to justify the issue of punitive damages being submitted to the jury. The trial court expressed this opinion at first by seemingly reducing the amount of the punitive damage award to zero, which would appear to implicate the granting of the motion for a remittitur. In actuality, what the trial court did was to vacate the entire punitive damage award, thereby granting the Bank's motion for judgment notwithstanding the verdict, on the issue of punitive damages, pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure.[7]

Because the trial court vacated the entire punitive damage award, no analysis was made regarding the amount of the punitive damage award as required by our opinion in *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). The trial court obviously reasoned that because the Bank's conduct did not entitle Mr. Alkire to a punitive damage award, the amount of the award was irrelevant.

### III.

### STANDARD OF REVIEW

■ Mr. Alkire frames the issue on this appeal in terms of the trial court's failure to conduct the nine-step post-trial analysis designed to measure the amount of the punitive damage award as directed by *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). We decline to accept this appeal in the shape moulded by Mr. Alkire.[8] The trial court dispensed with any analysis regarding the amount of the punitive damage award because it was superfluous. Why go through the analysis of determining whether a verdict is excessive if there is no verdict to analyze? The only issue on this appeal is whether the trial court was justified in vacating the punitive damage award on the ground that there was insufficient evidence of the type of malicious, wanton, willful, or reckless conduct on the part of the Bank toward Mr. Alkire to submit the issue of punitive damages to the jury.

We now frame our standard of review within the boundaries of the sufficiency of the evidence to support the punitive damage verdict and judgment entered on that verdict. This standard of review is a variation on the theme announced by this Court in two recent opinions: *Mildred L.M. v. John O.F.*, 192 W.Va. 345, 452 S.E.2d 436 (1994) and *Barefoot v. Sundale Nursing Home*, 193

---

6. All post-trial motions were to be considered in the alternative. The motion for a remittitur is technically a motion to alter or amend judgment pursuant to W. Va. R. Civ. P. 59(e), which provides:

   A motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment.

7. The trial court's comments regarding the various post-trial motions are revealing of its true intention as follows: "I have to give a judgment notwithstanding the verdict of the jury or I guess I have to remit this and the remittitur would be zero." As the written order states, "to the extent that the defendant's motion is for judgment notwithstanding the verdict as to the issue of punitive damages and seeks thereby to strike the jury's award of punitive damages, the motion is hereby GRANTED, and the punitive damages award is ORDERED stricken."

8. Although the issue we decide today was not precisely presented to us by the appellant, and

while we would not ordinarily take note of errors not called to our attention, we have the plenary power—indeed, the duty—to notice errors to which no exception has been taken, if the error is obvious from the record or appellate briefs, and if it would otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings, or otherwise result in a misleading application of the law. *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936); *Silber v. United States*, 370 U.S. 717, 718, 82 S.Ct. 1287, 1288, 8 L.Ed.2d 798 (1962) (per curiam); *see also New York Cent. R.R. Co. v. Johnson*, 279 U.S. 310, 318–19, 49 S.Ct. 300, 303–04, 73 L.Ed. 706, *as amended by* — U.S ——, 49 S.Ct. 417, — L.Ed.2d —— (1929) ("[F]ailure of counsel to particularize an exception will not preclude this Court from correcting the error."); *Mitchell v. Hadl*, 816 S.W.2d 183, 185 (Ky.1991) ("When the facts reveal a fundamental basis for decision not presented by the parties, it is our duty to address the issue to avoid a misleading application of the law.").

W.Va. 475, 457 S.E.2d 152 (1995). *Mildred L.M.* and *Barefoot*, like this case, engage in an examination of a decision relating to a motion for judgment notwithstanding the verdict under Rule 50(b) of the West Virginia Rules of Civil Procedure.

■ The procedural configuration of *Mildred L.M.* and *Barefoot* is significantly different from this case because in those cases, the trial court *denied* the motion for judgment notwithstanding the verdict, with an appeal filed by the moving party. In this case, the trial court *granted* the motion for judgment notwithstanding the verdict, and an appeal was filed by the nonmoving party. This procedural difference requires a transposition of the standard of review announced in *Mildred L.M.* and *Barefoot* regarding the denial of a motion for judgment notwithstanding the verdict to a standard of review adapted to the granting of a motion for judgment notwithstanding the verdict. Accordingly, the standard of review recited in Syllabus Point 1 in *Mildred L.M. v. John O.F.,* 192 W.Va. 345, 452 S.E.2d 436 (1994) and in Syllabus Point 1 in *Barefoot v. Sundale Nursing Home,* 193 W.Va. 475, 457 S.E.2d 152 (1995), and their progeny, is clarified to read as follows:

In reviewing a trial court's *denial* of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on a *denial* of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally *insufficient* to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.

■ The standard of review, when a trial court grants a motion for a judgment notwithstanding the verdict, such as in this case, will be as follows:

In reviewing a trial court's *granting* of a motion for judgment notwithstanding the verdict, it is not the task of the appellate court reviewing facts to determine how it would have ruled on the evidence presented. Its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below. Thus, in ruling on the *granting* of a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the nonmoving party. If on review, the evidence is shown to be legally *sufficient* to sustain the verdict, it is the obligation of the appellate court to reverse the circuit court and to order judgment for the appellant.

■ Having made those minor procedural adjustments to the formulation of the standard of review vis-à-vis the granting and denying of a motion for judgment notwithstanding the verdict, we can continue with our discussion of the standard of review of the evidence in this case. We now can extrapolate from our analysis in *Barefoot* to the extent that the trial court's granting of a motion under Rule 50(b) will be affirmed only if the facts and inferences point so strongly and overwhelmingly in favor of the movant that no reasonable jury could have reached a verdict against the movant. *Barefoot,* 193 W.Va. at 482, 457 S.E.2d at 159. In performing this analysis, the credibility of the witnesses will not be considered, conflicts in testimony will not be resolved, and the weight of the evidence will not be evaluated. In other words, we will affirm the circuit court's ruling granting the motion if, after scrutinizing the proof and inferences derivable therefrom in the light most favorable to Mr. Alkire (the nonmoving party), we determine that a reasonable fact finder could have reached but one conclusion: that the Bank was entitled to judgment. The granting of a motion for judgment notwithstanding the verdict is reviewed *de novo*, which triggers the same stringent decisional standards that are used by the circuit courts. *Barefoot,* 193 W.Va. at 482, 457 S.E.2d at 159. While a review of this motion is plenary, it is also circumscribed because we must review the evidence in a light most favorable to the nonmoving party. *Id.*

Against this analysis, we examine whether the trial court properly granted the Bank's

motion for a judgment notwithstanding the verdict.

## IV.

### DOES THE BANK'S CONDUCT JUSTIFY A PUNITIVE DAMAGE AWARD?

█ The type of conduct which gives rise to punitive damages in West Virginia was first formulated in *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895), where the Court stated in Syllabus Point 4:

In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.

Although there are tempting shorthand phrases to characterize the type of conduct which warrants punitive damage consideration, for example, "conscious indifference," *Glasscock v. Armstrong Cork Co.*, 946 F.2d 1085, 1093 (5th Cir.1991), *reh'g denied*, 951 F.2d 347, *cert. denied Celotex Corp. v. Glasscock*, 503 U.S. 1011, 112 S.Ct. 1778, 118 L.Ed.2d 435 (1992); "reckless, willful and wanton," *Defender Industries, Inc. v. Northwestern Mutual Life Ins. Co.*, 938 F.2d 502, 505 (4th Cir.1991); "particularly egregious" *Eichenseer v. Reserve Life Ins. Co.*, 934 F.2d 1377, 1382 (5th Cir.1991), we are still committed to the traditional rule announced in *Mayer* and cited with approval in a number of subsequent cases. *See* Syllabus Point 1, *Goodwin v. Thomas*, 184 W.Va. 611, 403 S.E.2d 13 (1991); Syllabus Point 1, *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982), *overruled, in part, on other grounds by* Syllabus Point 1, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). *See also Davis v. Celotex Corp.*, 187 W.Va. 566, 420 S.E.2d 557 (1992); Syllabus Point 9, *Cook v. Heck's Inc.*, 176 W.Va. 368, 342 S.E.2d 453 (1986); Syllabus Point 1, *Painter v. Raines Lincoln Mercury, Inc.*, 174 W.Va. 115, 323 S.E.2d 596 (1984); *Bond v. City of Huntington*, 166 W.Va. 581, 591 n. 8, 276 S.E.2d 539, 545 n. 8 (1981); Syllabus Point 3, *Stevens v. Friedman*, 58 W.Va. 78, 51 S.E. 132 (1905).

█ Do the facts and inferences in this case point so strongly and overwhelmingly in favor of the Bank to the extent that it did not act so maliciously, oppressively, wantonly, willfully, recklessly, or with criminal indifference to civil obligations that no reasonable jury could have reached a verdict against the Bank on the issue of punitive damages?

We are convinced after reviewing this entire record that the facts and inferences do not point so strongly and overwhelmingly in favor of the Bank to the extent that no reasonable jury could have reached a verdict against the Bank. After scrutinizing the proof and inferences derivable therefrom in the light most hospitable to Mr. Alkire, we are convinced that the evidence of the Bank's misconduct both before and after the recovery of the missing deposit was such that a reasonable trier of fact could have easily reached a decision which punishes the Bank and returns a punitive damage award in favor of Mr. Alkire.

This record is replete with evidence to the extent that for some inexplicable reason the Bank was determined not to do all that it could have reasonably done to prevent the disintegration of Mr. Alkire's good name and reputation in the community of Parsons. Mr. Alkire was branded in this small Tucker County community as a thief. The Bank had the opportunity to remove the cloud of suspicion, but it exercised a meaningful choice to misrepresent the status of the search for the missing deposit, and thereafter concealed its recovery which could have immediately restored Mr. Alkire's good reputation in the community.[9]

We learn from reviewing this transcript that the jury heard testimony of a deliberate

---

9. The conduct of the Bank brings to mind:
   Who steals my purse steals trash; 'tis something, nothing;
   . . .

   But he that filches from me my good name
   Robs me of that which not enriches him,
   And makes me poor indeed.
   William Shakespeare, Othello act 3, sc. 3.

decision by the Bank to misinform the Alkire family after they repeatedly requested that representatives of the manufacturer of the night depository (Mosler) be retained to determine if the missing deposit was lost within the system and for some mechanical reason could not be found. The jury was told that the Alkire family was willing to pay for this type of investigation. The Bank informed the Alkires that such an investigation had been completed and produced no results. The Bank was not telling the truth.

Further, the jury was told that once the deposit was recovered, the Bank chose not to inform Mr. Alkire of the discovery, and but for an anonymous telephone call to the Alkire family, there was a reasonable likelihood that the recovery of the missing deposit never would have been made public, thus permanently condemning Mr. Alkire for an act of which he was completely innocent.

When we analyze the evidence of the Bank's conduct in a light most favorable to Mr. Alkire, we determine that a reasonable fact finder could have reached the conclusion that Mr. Alkire was entitled to a judgment of punitive damages.

**V.**

**DEVELOPMENT ON REMAND**

We have determined that Mr. Alkire was entitled to *a* punitive damage award. The unresolved question is whether Mr. Alkire is entitled to *the* punitive damage verdict returned by the jury in the amount of $1,050,-000.

▮▮▮▮▮ As we noted, Mr. Alkire invites this court to perform a *de novo* review of all of the *Garnes* factors and thereafter to reinstate the entire punitive damage award of $1,050,000. We decline that invitation since under our punitive damage jurisprudence, it is imperative that the amount of the punitive damage award be reviewed in the first instance by the trial court by applying the model specified in Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd*, 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).[10] Thereafter, and upon petition, this Court will review the amount of the punitive damage

---

**10.** Syllabus Point 3 of *Garnes* instructs circuit courts how to instruct juries in determining the amount of punitive damages to award, and Syllabus Point 4 instructs circuit courts how to review the propriety of the amount of the punitive damages awarded by a jury:

> 3. When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:
>
> (1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.
>
> (2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in

similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

> (3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.
>
> (4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.
>
> (5) The financial position of the defendant is relevant.

> 4. When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:
>
> (1) The costs of the litigation;
>
> (2) Any criminal sanctions imposed on the defendant for his conduct;
>
> (3) Any other civil actions against the same defendant, based on the same conduct; and
>
> (4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases

award, applying the standard specified in Syllabus Point 5 of *Garnes*.[11]

Because the trial court, for reasons we have discussed, did not submit the punitive damage award to a *Garnes* analysis to determine whether or not it was excessive, such an analysis must now be done upon remand.

■ We would inform the trial court that this analysis should be conducted exclusively within the boundaries of Syllabus Points 3 and 4 of *Garnes*, and Syllabus Point 15 of *TXO*.[12] We believe that it is appropriate at this time to remove from the lexicon of reviewing the amount of a punitive damage award the terms "really mean" and "really stupid," as they were applied in *TXO*.[13]

■ We should emphasize that our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to *a* punitive damage award, *see Mayer v. Frobe*, 40

W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated by *Garnes* to determine if *the* punitive damage award is excessive.

## VI.

## CONCLUSION

The evidence on the issue of punitive damages is shown to be legally sufficient to sustain a verdict of punitive damages in favor of Mr. Alkire. This case is remanded to the Circuit Court of Tucker County to perform an analysis upon the punitive damage verdict to determine whether the award of $1,050,000 is excessive as tested by Syllabus Points 3 and 4 of *Garnes* and Syllabus Point 15 of *TXO*.

Reversed and remanded with directions.

the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.
Syllabus Points 3 & 4, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

11. Syllabus Point 5 of *Garnes* provides:

Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.
Syllabus Point 5, *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).

12. Syllabus Point 15, *TXO Production Corp. v. Alliance Resources Corp.*, 187 W.Va. 457, 419 S.E.2d 870 (1992), provides as follows:

The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no

actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not *per se* unconstitutional.

13. A "really mean" and "really stupid" analogy was suggested in the majority opinion in *TXO* to assist the trial court in determining whether the ratio of compensatory to punitive damages was proper. This analysis was not embodied within any syllabus point of the opinion. Indeed, the United States Supreme Court, in affirming *TXO*, noted that the terms "really mean" and "really stupid" "played little, if any, part in [the West Virginia Supreme Court's] actual evaluation of the propriety of the damages award [as evidenced] from the reasoning in its thorough opinion." *TXO Production Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 465, 113 S.Ct. 2711, 2724, 125 L.Ed.2d 366 (1993), *aff'g* 187 W.Va. 457, 419 S.E.2d 870 (1992).

We believe the dichotomy of "really mean" and "really stupid" can cause more mischief than benefit to the cause of analyzing the ratio of a compensatory to a punitive damage award. Part of the mischief is created when the "really mean" and "really stupid" standard bleeds into the analysis of whether the conduct of an actor justifies any punitive damage award in the first instance. In addition, Syllabus Point 15 in *TXO* does provide a useful barometer in calculating the ratio between compensatory and punitive damage, and while that analysis is more prosaic, it is infinitely more functional.