490 S.E.2d 678

**Cheryl L. VANDEVENDER, Plaintiff Below, Appellee,**

v.

**SHEETZ, INC., a Pennsylvania Corporation, Defendant Below, Appellant,**

**Karen Foltz, Defendant Below, Appellee.**

No. 23463.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 4, 1997.

Decided July 11, 1997.

Dissenting Opinion of Justice Maynard July 17, 1997.

David M. Hammer, Robert Schiavoni, Hammer, Ferretti & Schiavoni, Martinsburg, for Appellee Vandevender.

Thomas R. Goodwin, Richard D. Owen, Susan C. Whittemeir, Goodwin & Goodwin, Charleston, for Appellant.

Harry P. Waddell, Wilkes & Waddell, Martinsburg, for Appellee Foltz.

PER CURIAM:

Through this appeal, Appellee Sheetz, Inc. ("Sheetz") challenges the verdict awarded to Appellee Cheryl Vandevender in a wrongful discharge case on grounds of unconstitutionally excessive punitive damages. After reviewing the record of this case, we determine that the punitive damages awarded in connection with the theories of unlawful termination and refusal to permit Appellee to apply for rehire or return to work were excessive under our prior holdings. However, we uphold the punitive damages awarded in connection with the theory of retaliation.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Ms. Vandevender was hired as a salesperson by Sheetz for employ in one of its convenience stores on June 8, 1989. Within six months, she was promoted to second assistant manager. While at work on January 4, 1991, Appellee suffered a back injury.[1] She first saw a physician in connection with this back injury on January 21, 1991.[2] Despite her injury, she continued to work for a number of months. Ms. Vandevender began receiving temporary total disability ("TTD") benefits on July 30, 1991, in connection with the back injury she sustained while employed at Sheetz. She underwent back surgery on October 7, 1991.

In either August or October of 1992[3] Appellee met with Sheetz' store manager Karen Foltz and informed her that she was able to

---

1. At the time of the injury, Appellee was making sandwiches and apparently suffered the injury while trying to remove the lid from a large pickle jar.

2. Prior to her employment with Sheetz, Ms. Vandevender had injured her back and undergone surgery for the injury.

3. Whereas Appellee testified that this meeting occurred in August, the circuit court, in its order denying Appellant's motion for judgment notwithstanding the verdict, states that this meeting happened in October of 1992.

come back to work with the permanent limitation of performing no heavy lifting. Ms. Foltz told Appellee that she could not return to work, pursuant to company policy, unless she was "100%." Because Sheetz would not allow her to return to work with restrictions, Appellee's physician continued to certify her as TTD.

Sheetz sent Appellee a letter on March 15, 1993, stating its policy that a twelve-month absence from work is treated as a resignation.[4] The correspondence indicated that if Appellee was able to work, she should contact the company's human resource department within one week of her receipt of the letter and that she would be eligible for rehire upon appropriate medical release subject to her qualifications and abilities in relation to the job duties and responsibilities. Appellee did not contact either Sheetz' human resource department or her store manager following her receipt of this letter. In accordance with its company policy regarding a one-year absence, Sheetz fired Appellee in March 1993.

Appellee was examined by a workers' compensation physician on June 19, 1994, and determined to have reached her maximum degree of medical improvement, according to the June 28, 1994, report of Dr. Siad. As a result of this medical determination, Appellee's TTD benefits were terminated on October 11, 1994.

On October 12, 1994, Trudy Rohrbaugh, a West Virginia Rehabilitation Counselor, called Ms. Foltz to inquire about Appellee returning to work. While Ms. Foltz reportedly told Ms. Rohrbaugh that it was her understanding that it would be futile for Appellee to apply for rehire, she did instruct the rehabilitation counselor to call Sheetz' corporate office concerning the company's reemployment policy. It is undisputed that neither Appellee nor Ms. Rohrbaugh called Sheetz' corporate office to inquire regarding Sheetz' policy.

On December 1, 1994, Appellee filed a civil action against Sheetz for refusing to rehire an employee discharged following a work-related injury in violation of the anti-discrimination provisions of the West Virginia Workers' Compensation Act ("Workers' Compensation Act")[5] and for refusing to consider a prior employee for rehire based on an actual or perceived handicap in violation of the West Virginia Human Rights Act ("Human Rights Act").[6] During the discovery phase of the litigation, Ms. Foltz testified that Appellee could have been accommodated since the job functions listed by Sheetz requiring employees to lift up to fifty pounds and to stand for eight hours a day were not actually essential.[7] In response to this deposition testimony, Appellee demanded to be returned to her job.

Sheetz offered to hire Appellee as a sales clerk on February 3, 1995.[8] She returned to work at Sheetz on April 17, 1995. The regional manager, Ms. Imler, was present on the date of Appellee's return to work, and requested that Appellee provide her with a list of work restrictions. Ms. Imler demanded to see written restrictions despite the fact that Sheetz had required Appellee to undergo an independent medical examination one month prior to her return to work and despite the fact that Ms. Imler and Sheetz' district manager, Ms. Anslinger, had specifically discussed the results of Appellee's

4. The actual wording of the letter concerning this policy was that " '[a]ny employee of Sheetz, Inc. who is absent from work due to disability (either work related or non-work related) or illness for a total of twelve (12) consecutive or non-consecutive months shall be considered to have resigned his or her employment with Sheetz, Inc.' " At trial, Sheetz admitted that this letter violated the anti-discrimination provisions of West Virginia Code § 23–5A–3(a) (1994).

5. *See* W. Va.Code §§ 23–5A–1 to –3 (1994).

6. *See* W. Va.Code §§ 5–11–1 to –19 (1994 & Supp.1996).

7. Ms. Foltz was fired five weeks after her deposition. The trial court, upon objection of Sheetz' counsel on grounds of relevancy, refused to permit Appellee's counsel to inquire into the basis for her firing. The trial court employed the balancing test required by Rule 403 of the Rules of Evidence and determined that "any probative value involved in this evidence would be substantially outweighed by unfair prejudice."

8. Apparently, the position of assistant manager no longer existed due to restructuring.

medical examination. Ms. Imler took the position that until she received an updated doctor's slip, she did not "see" any physical restrictions.[9] Ms. Imler ordered her to obtain a current medical examination by Friday of the same week, although Appellee was scheduled to work every day that week. Pursuant to Ms. Imler's directive,[10] Appellee began to stock the cooler, but had to stop after only twenty minutes of performing this task because of back spasms.[11] Appellee continued to work for several more hours, but did not inform anyone at the store regarding her back pains. She called the next morning and said she would not be returning to work on the advice of her attorney.

In June 1995, Appellee amended her complaint to allege that Sheetz failed to accommodate her during the period of 1991 to 1995 in violation of the Human Rights Act and that Ms. Imler's request that she stock the cooler on April 17, 1995, constituted an unlawful reprisal in violation of the Human Rights Act. *See* W. Va.Code § 5–11–9(7)(C). A three-day jury trial in September 1995 resulted in a favorable verdict for Appellee. She was awarded $130,066 in compensatory damages, $170,000 for noneconomic damages,[12] and $2,699,000 in punitive damages. Appellant filed motions for judgment notwithstanding the verdict or in the alternative, a new trial or remittitur. This appeal arises from the circuit court's denial of those motions.[13]

## II. DISCUSSION

### A. Federal Law

Sheetz asserts that under the standards set forth by the United States Supreme Court in *BMW of North America, Inc. v.*

*Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the punitive damages award was grossly excessive in violation of Sheetz' due process rights. Sheetz also maintains that the circuit court failed to conduct a "meaningful and adequate review" of the punitive damages award as required by *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991).

As the United States Supreme Court articulated in *BMW*, "[t]he Due Process Clause of the Fourteenth Amendment prohibits a State from imposing a " ' " "grossly excessive" ' " punishment on a tortfeasor." 517 U.S. at ——, 116 S.Ct. at 1592 (quoting *TXO Production Corp. v. Alliance Resources Corp.,* 509 U.S. 443, 454, 113 S.Ct. 2711, 2718, 125 L.Ed.2d 366 (1993)). In *BMW*, the plaintiff brought suit against the automobile manufacturer for failing to disclose that the vehicle he purchased had been repainted following damage to the car's body. 517 U.S. at ——, 116 S.Ct. at 1593. The Georgia jury awarded $4,000 in compensatory damages and $4,000,000 in punitive damages. Despite the state supreme court's remittitur of the punitive damages award to $2,000,000, the United States Supreme Court determined that the award was grossly excessive in violation of the Due Process Clause. *Id.* at ——, 116 S.Ct. at 1604.

Stressing the totally economic nature of the compensatory damages awarded in *BMW*, the Supreme Court identified three guideposts for use in examining the companion Due Process Clause concerns of fair notice of the type of conduct that will subject a defendant to punishment and fair notice of the severity of the penalty that may be imposed for such conduct. These "guideposts" are: (1) the degree of reprehensibility of the defendant's conduct; (2) the ratio of punitive

---

**9.** Appellee's work restrictions were that she could only lift fifteen pounds at a time and she had to use a stool for periodic standing breaks.

**10.** Randy Wallen, the store manager, cautioned Appellee not to lift anything and told her that she could take a break after she finished her job and cleaned up the area.

**11.** The record indicates that Appellee did not lift anything heavier than a six-pack of Pepsi or a two-liter bottle of soda while stocking the cooler.

**12.** These damages were awarded for "emotional distress, upset, embarrassment, and humiliation."

**13.** The circuit court did grant Appellant's motion for remittitur with regard to $6,200 of the $13,200 the jury awarded for medical expenses on the grounds that "[n]o evidence was presented which would justify such an award."

damages to the actual harm inflicted on the plaintiff; and (3) a comparison of the punitive damages award with the civil or criminal penalties that could be imposed for comparable misconduct. 517 U.S. at ——, 116 S.Ct. at 1598–1603. Appellant suggests that a modification or refinement of this Court's holding in *Garnes* is required based on the Supreme Court's pronouncement of these three "guideposts." *See* 186 W.Va. at 667–69, 413 S.E.2d at 908–10.

The Due Process Clause issue raised by Appellant involves the procedural concern of whether Sheetz received adequate notice of the severity of the penalty imposed by the award. As noted in *BMW*, our system of jurisprudence includes the axiom that "a person receive fair notice not only of the conduct that will subject him to punishment but also of the severity of the penalty that a State may impose." 517 U.S. at —— n. 22, 116 S.Ct. at 1598 n. 22 (observing that "strict constitutional safeguards afforded to criminal defendants are not applicable to civil cases, but the basic protections against 'judgments without notice' afforded by the Due Process Clause is implicated by civil *penalties*") (quoting *Shaffer v. Heitner*, 433 U.S. 186, 217, 97 S.Ct. 2569, 2586–87, 53 L.Ed.2d 683 (1977)).

### B. State Law

■■■ Recent developments concerning the area of punitive damages began with this Court's pronouncement in syllabus point one of *Garnes* that "[p]unitive damages must bear a reasonable relationship to the potential of harm caused by the defendant's actions." Syl. Pt. 1, in part, 186 W.Va. at 658, 413 S.E.2d at 899. Through that decision we imposed the necessary, but previously lacking, requirement of "a meaningful and adequate review" by both the trial and appellate court systems, announcing that

Under our system for an award and review of punitive damage awards, there must be: (1) a reasonable constraint on jury discretion; (2) a meaningful and adequate review by the trial court using well-established principles; and (3) a meaningful and adequate appellate review, which

may occur when an application is made for an appeal.

*Id.* at syl. pt. 2.

■■■ As a necessary corollary to the review requirements imposed by *Garnes*, we provided trial courts with the following instructions regarding what factors they should advise juries to consider in making punitive damages awards:

When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

Syl. Pt. 3, *Garnes,* 186 W.Va. at 658, 413 S.E.2d at 899–900.

■ Following the return of a punitive damages award, *Garnes* requires the trial court to make a "meaningful and adequate review" of the award.

When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Syl. Pt. 4, in part, *Garnes,* 186 W.Va. at 659, 413 S.E.2d at 900.

■ With regard to *this* Court's review of punitive damages awards, we stated in syllabus point five of *Garnes* that:

Upon petition, this Court will review all punitive damage awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

186 W.Va. at 659, 413 S.E.2d at 900.

■ Following *Garnes,* we next addressed the subject of punitive damages awards in *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). That decision, while applying the *Garnes* factors, made a distinction between those defendants who did not intentionally or malevolently harm a plaintiff and those defendants who intentionally or malevolently committed acts they knew to be harmful.[14] With regard to those defendants who had no actual intention to commit harm, we held in syllabus point fifteen of *TXO* that

The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, when the defendant has acted with actual evil intention, much higher ratios are not *per se* unconstitutional.

187 W.Va. at 461, 419 S.E.2d at 874.

■ Most recently, we exhorted in *Alkire v. First National Bank,* 197 W.Va. 122, 475 S.E.2d 122 (1996), that:

Under our punitive damage jurisprudence, it is imperative that the amount of the punitive damage award be reviewed in the first instance by the trial court by applying the model specified in Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). Thereafter, and upon petition, this Court will review the amount of the

---

**14.** These categories were previously identified under the nomenclature of "really stupid" defendants and "really mean" defendants, respectively. In syllabus point six of *Alkire v. First National Bank,* 197 W.Va. 122, 475 S.E.2d 122 (1996), "[w]e remove[d] from the lexicon of reviewing the amount of a punitive damage award the terms 'really mean' and 'really stupid' as they were applied in *TXO.*" In affirming our *TXO* decision, the United States Supreme Court observed that these two "terms played little, if any, part in its [the West Virginia Supreme Court of Appeals'] actual evaluation of the propriety of the damages award [a]s eviden[ced] from the reasoning in its thorough opinion...." 509 U.S. at 465, 113 S.Ct. at 2724.

punitive damage award, applying the standard specified in Syllabus Point 5 of *Garnes.*

Syl. Pt. 5, 197 W.Va. at 124–25, 475 S.E.2d at 124–25. We further stated that:

> Every post-trial analysis as to the amount of the punitive damage award should be conducted by the trial court exclusively within the boundaries of Syllabus Points 3 and 4 of *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991), and Syllabus Point 15 of *TXO Production Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 (1992) [,*aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) ]. We remove from the lexicon of reviewing the amount of a punitive damage award the terms "really mean" and "really stupid," as they were applied in *TXO.*

Syl. Pt. 6, 197 W.Va. at 125, 475 S.E.2d at 125.

■ In syllabus point seven of *Alkire,* we identified the model under which punitive damage awards are reviewed:

> Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to a punitive damage award under *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if *the* punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991).

197 W.Va. at 125, 475 S.E.2d at 125.

Under this two-stage model, we first examine whether a punitive damage award was permitted for the conduct of Sheetz toward Appellee. *See id.* In her original complaint, Appellee asserted two theories against Sheetz, both predicated on the company's failure to rehire her following discharge subsequent to a work-related injury. In her amended complaint, she included theories of liability for Sheetz' alleged failure to accommodate her physical limitations and for committing an unlawful reprisal in retaliation for Appellee's filing of a workers' compensation claim. Appellee's theories of recovery in both her original complaint and the amended complaint were expressly pled as violations of the Human Rights Act and the Workers' Compensation Act.

■ Sheetz argues on appeal that punitive damages are not recoverable for violations of the anti-discrimination provisions of the Workers' Compensation Act or the Human Rights Act. Appellee argues,[15] and Sheetz admits, that it failed to raise this substantive objection below.[16] Our review of the record confirms a failure to preserve this issue for appeal.[17] As we held in syllabus point two of *Sands v. Security Trust Co.,* 143 W.Va. 522, 102 S.E.2d 733 (1958), "[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Accordingly, we decline to address this issue for the first time on appeal.

### 1. Did Sheetz' conduct permit an award of punitive damages?

■ In *Alkire,* we revisited the types of conduct that give rise to punitive damages

---

**15.** Appellee notes in its brief that "[t]his Court will find no affirmative constitutional defense in the pleadings, no dispositive motion, no motion in limine, no objection, no reference in its pretrial memorandum, no reference in its post-trial motion, no reference in appellant's petition to this Court, and no reference anywhere in the record, opposing an award of punitive damages on the basis that such an award is not available as a matter of law."

**16.** In its reply brief, Sheetz acknowledges that appellate counsel raised the precise issue of the recoverability of punitive damages under the Human Rights Act and the Workers' Compensation Act "for the first time in its initial brief" to this Court.

**17.** Although Sheetz filed a motion in limine with regard to punitive damages, the basis for such motion was the lack of any evidence of willful, wanton, reckless, or malicious conduct on the part of Sheetz that would permit punitive damages to be awarded by law. Similarly, Sheetz' only objection at trial to punitive damages was on grounds of insufficient evidence of a prima facie punitive damages case to permit the jury's consideration of defendant's financial information.

with reference to syllabus point four of *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895):

'In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive, or vindictive damages; these terms being synonymous.'

197 W.Va. at 129, 475 S.E.2d at 129 (quoting *Mayer*, 40 W.Va. at 247, 22 S.E. at 58). Evidence of Sheetz' conduct cited by Appellee that entitles her to a punitive damages award includes Sheetz' admission of violating this state's public policy to return injured workers to the workplace as quickly as possible. *See* W. Va.Code § 23–4–7(a) (Supp. 1996). Sheetz also admitted in its opening statement that its company policy not to permit injured employees to return to work until they are "100%" was in violation of state law.[18] *See* W. Va.Code § 23–5A–3(b) (1994).[19] Appellee further cites Sheetz' admission that it could have accommodated Appellee's physical limitations and permitted her to return to work early into this matter as violative of state law.[20] *See* W. Va.Code § 5–11–9 (1994). Only when she made a demand to return to work, following Ms. Foltz' deposition, was Appellee permitted to return to work.

Additional evidence of improper conduct involves Sheetz' failure to pay even one penny of Appellee's medical expenses as of November 1995, despite its stipulation to $7,000 in medical expenses. Similarly offensive, as the trial court observed in its order denying Sheetz' motion for judgment notwithstanding the verdict, was Sheetz' complete failure to engage in settlement negotiations.[21]

Further factual evidence of Sheetz' improper conduct toward Appellee included the regional manager's feigning ignorance regarding knowledge of any physical limitations when she returned to work. Ms. Anslinger testified that she told Ms. Imler that Appellee was not to do any bending, lifting or twisting. Yet, when Appellee returned to work, Ms. Imler took the position that "until I see ... [an updated physician's statement], you're just like one of the others." This deceitful tack was further exacerbated by Ms. Imler's demand that Appellee have a current medical examination completed by the end of the work week, in spite of the fact that Appellee was scheduled to work every day that week.

The jury also heard evidence of surveillance efforts that Sheetz undertook in connection with both Appellee's return to work and her later visits to the store. The day after Appellee returned to work, Ms. Imler returned to the store to retrieve the tape that was made of Appellee the day before. The trial court notes, in its order, that various sales clerks began taking pictures of Appellee when she shopped at Sheetz' store and that these pictures all made their way to Ms. Anslinger's office at corporate headquarters. The trial court further observed that "[n]o one accepted responsibility at trial for this surveillance."

 Given Sheetz' admissions of discriminatory acts that constitute violations of both state law and public policy,[22] we conclude

---

18. According to *Sheetz*, this policy is no longer in effect.

19. That section states, in pertinent part, that:

It shall be a discriminatory practice within the meaning of section one of this article [W. Va.Code § 23–5A–1] for an employer to fail to reinstate an employee who has *sustained* a compensable injury to the employee's former position of employment upon demand for such reinstatement provided that the position is available and the employee is not disabled from performing the duties of such position. W.Va.Code § 23–5A–3(b).

20. In its opening statement, Sheetz stated "they probably ought to have hired her on October 12[, 1994] when Trudy Rohrbaugh called."

21. Appellee had offered to settle the case for $30,000 plus her job back during the early stages of this litigation. The trial court notes that Sheetz "never offered a single cent to settle this case."

22. Sheetz admits that its "personnel erroneously adopted two policies that were in violation of West Virginia law: an unwritten policy that required all workers to be 100% before returning to work and a written policy that led to the discharge of employees absent for more than one year."

that sufficient evidence was presented of willful, wanton, and/or reckless conduct that warranted a consideration of punitive damages by the jury. In addition to the discriminatory conduct which Sheetz admitted, the record is replete with further examples of conduct justifying an award of punitive damages, not the least of which was Sheetz' willful denial of knowledge of Appellee's medical restrictions.

## 2. Meaningful and Adequate Review

The trial court's understanding of its review obligations under *Garnes* is apparent from the order denying Sheetz' motion for judgment notwithstanding the verdict:

> The Court ... has considered the evidence adduced at trial and has: reviewed whether the punitive damages awarded bear a reasonable relationship to the harm that is likely to occur from Sheetz, Inc.'s conduct as well as the harm that has actually occurred; reviewed the reprehensibility of Sheetz, Inc.'s conduct; considered whether Sheetz, Inc. profited from its wrongful conduct; considered Sheetz, Inc.'s financial position; considered the costs of litigation, the lack of any criminal sanction, the absence of other civil actions based upon the same conduct, the appropriateness of punitive damages to encourage fair and reasonable settlement once the fact that a clear wrong was committed is apparent, and, as a matter of fundamental fairness, whether the punitive damages awarded bear a reasonable relationship to the compensatory damages awarded.

In reviewing the facts of the case against these standards, the trial court opined:

> Sheetz, Inc. continued upon its illegal course of conduct for a period of nearly five years. Such acts included refusing to accommodate plaintiff's work restrictions, refusing to reinstate plaintiff after suffering a compensable workplace injury, discharging plaintiff from employment, refusing to rehire plaintiff, and refusing to allow plaintiff to even apply for reemployment. Other illegal acts that justify a substantial award of punitive damages include retaliating against a manager who testified during a deposition contrary to Sheetz, Inc.'s posi-

tion, and retaliating against plaintiff upon her negotiated return to work by requiring her to perform work activities which defendant's managers knew she could not perform without risking re-aggravating her injuries or causing new injury.

> The Court further finds that Sheetz, Inc., by policy and practice, has attempted to evade its responsibilities to workers injured in the line of duty by discharging them and refusing, in derogation of our laws, to re-employ such injured workers. Such policies and practices have the effect of increasing Sheetz, Inc.'s profits at the expense of honest competitors, other honest employers and their employees, and to the detriment of the citizens of this State. The Court notes that most, if not all of the operative facts in this case, took place after the passage of the Americans with Disabilities Act, an Act that has been the subject of considerable public discussion and awareness. It is simply not credible for Sheetz, Inc. to claim, as it attempted to do in argument, that it made "mistakes." Indeed, Sheetz, Inc. paid bonuses to managers based on their ability to reduce Workers' Compensation premiums, thus encouraging conduct that violates State public policy.

> . . . .

> Moreover, the Court finds that the punitive damages awarded bear a reasonable relationship to the compensatory damages due in considerable part, to the affirmative, retaliatory conduct of Sheetz, Inc. in refusing to accommodate plaintiff, discharging her, refusing to allow her to reapply for employment, and in retaliating against her when she was finally returned to work.

Our review of the record reveals that the trial court properly engaged in the review process required by this Court in *Garnes* for awards of punitive damages. *See* 186 W.Va. at 667–69, 413 S.E.2d at 908–10. Accordingly, we reject Sheetz' contention that it was denied a "meaningful and adequate" review of the punitive damages award. *Id.*

## 3. Excessiveness of the Punitive Damage Award

Returning to the crux of this appeal, we must now examine whether the punitive dam-

ages award was excessive. Sheetz states its assignments of error rather conclusorily, and certainly not within the directive of syllabus point five of *Garnes* that requires a petitioner to address "with particularity" the factors set forth in syllabus points three and four of that decision and to "summariz[e] the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage." 186 W.Va. at 659, 413 S.E.2d at 900. Sheetz argues that the punitive damages awarded do not bear a reasonable relationship to the harm that is likely to occur or that has actually occurred. *See id.* at 658, 413 S.E.2d at 899, syl. pt. 3. Rather than summarizing the evidence presented on this issue at trial or post-trial, however, Sheetz merely offers its version of Appellee's harm as the loss of four months' wages from the date when her doctor released her to come to work on October 12, 1994,[23] until February 3, 1995, when it offered to reemploy her. Sheetz asserts that besides this minor period of lost wages, Appellee's only other loss "as a result of any claimed culpable conduct on the part of Sheetz was that she spent twenty minutes in the cooler on April 17, 1995." Observing that the jury awarded Appellee nearly $125,000 for past and future wages,

medical expenses, and educational expenses,[24] Sheetz calculates the ratio of punitives to compensatory damages as nearly 23 to one [25] and concludes that this is necessarily excessive. We do not find the harm suffered by Appellee to be as nominal as Sheetz suggests, nor do our calculations [26] of punitives to compensatories result in the high ratio claimed by Appellee.

 At the core of any appellate review of punitive damages is the concern that "the punitive damages are reasonable in their amount and rational in light of their purpose to punish what has occurred and to deter its repetition." *Pacific Mut. Life Insur. Co. v. Haslip,* 499 U.S. 1, 21, 111 S.Ct. 1032, 1044, 113 L.Ed.2d 1 (1991). While the impossibility of crafting a mathematically precise bright line for purposes of examining punitive damages awards is well-accepted, the admittedly inexact alternative has been to view the award against a host of factors intended to assure that "the discretion [with which punitive damages are awarded] is exercised within reasonable constraints, [and] due process is satisfied." *Id.* at 20, 111 S.Ct. at 1044. In this State, those factors are referred to as the *Garnes* factors.[27]

23. Appellee's physician, Dr. Siad testified that the only reason he did not release Appellee at an earlier time was because of his understanding that Sheetz would not rehire her unless she was "100%." Also introduced at trial was a July 1994 letter from Dr. Siad to Sheetz indicating that Appellee's physical limitations would not prevent her from working if reasonable accommodations were made.

24. Although the jury awarded Appellee $130,066 in economic damages, the trial court remitted that amount by $6,200 after concluding that the $13,200 awarded by the jury for medical expenses was not supported by the evidence. Following the remittitur, the award of economic damages would have been $123,866.

25. In its petition, Sheetz notes that it included the $170,000 awarded to Appellee for noneconomic damages as part of the punitive damages award on the grounds that "damages for emotional distress without proof of physical trauma are essentially punitive damages...." As support for this proposition, Sheetz cites *Harless v. First National Bank,* 169 W.Va. 673, 289 S.E.2d 692 (1982). While that decision discusses how a jury award of emotional distress damages where no physical trauma exists can be likened to that of a punitive damages award in that the jury may

have assessed defendant's conduct in making the award, *Harless* clearly categorizes emotional distress damages as compensatory in stating that "[t]he recovery for emotional distress *as well as other compensatory damages* such as lost wages should adequately compensate the plaintiff." *Id.* at 690–92, 289 S.E.2d at 702–03 (emphasis supplied).

26. For reasons discussed *infra,* we view separately, as did the jury, the damages awarded for the unlawful termination and failure to rehire from the retaliatory damages. For the former theories, the jury awarded $221,748 in compensatories (including emotional distress) and $1,575,000 in punitives. The ratio of punitives to compensatories on those claims amounts to 7:1. For the retaliation claim, the jury award of compensatories following remittitur was $72,118 and $1,124,000 in punitives. The ratio for this theory is 15:1.

27. The *Garnes* factors were derived in part from the factors used by the Alabama state court in *Haslip. See* 509 U.S. at 21–22, 113 S.Ct. at 2473–74 (discussing criteria used by Alabama Supreme Court to determine excessiveness of punitive damages award); *see generally Green Oil Co. v. Hornsby,* 539 So.2d 218 (Ala.1989).

The first factor set forth in *Garnes* requires that "[p]unitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred." Syl. Pt. 3, in part, *Garnes,* 186 W.Va. at 658, 413 S.E.2d at 899. Inherent to this inquiry is the notion that the amount of the damages awarded are directly connected to the nature of the defendant's conduct—the more egregious the conduct of the defendant, the greater the award. *See BMW,* 517 U.S. at ——, 116 S.Ct. at 1599 (noting that reasonableness requirement of punitive damages award is premised on "the accepted view that some wrongs are more blameworthy than others"). Whereas this Court previously created a distinction between really mean and really stupid conduct, we now view the defendant's conduct in terms of traditional concepts long associated with punitive damage awards. *See TXO,* 187 W.Va. at 474–76, 419 S.E.2d at 887–89; *Alkire,* 197 W. Va. at 131, 475 S.E.2d at 131, and syl. pt. 6.

■ In syllabus point fifteen of *TXO* we distinguished between conduct that demonstrates "extreme negligence or wanton disregard" and conduct that evinces an "actual intention to cause harm." 187 W.Va. at 461, 419 S.E.2d at 874. The significance of that distinction was our formulation of an outer limit of five to one with regard to the ratio of punitives to compensatory damages in cases that fall into the first category—that is, those cases in which the defendant's conduct registers on the scale of extreme negligence or wanton disregard. *Id.* Only in those cases where the defendant can be shown to have actually intended to cause harm is the ratio of punitives to compensatories permitted to climb higher without "rais[ing] a suspicious judicial eyebrow." *TXO,* 509 U.S. at 481, 113 S.Ct. at 2732 (O'Connor, J., dissenting). The type of evidence presented against Sheetz in this case with regard to the unlawful termination/failure to hire claims suggests an employer who clearly acted in contravention of state law and policies, but not an employer whose conduct indicates a malicious intent to prevent Appellee from returning to its employ. Simply put, bad or legally incorrect corporate policy is not the equivalent of a mean-spirited, evil intent to cause harm. Conversely, the evidence adduced in connection with the retaliation theory—Sheetz' acts upon Appellee's return to work—fall into a different category. The acts of Ms. Imler in willfully pretending to be unaware of any work restrictions when Appellee returned to work, directing her to get yet another doctor's examination by the end of the work week, directing Appellee to engage in strenuous physical work right off the bat, as well as Sheetz' surveillance of Appellee during both her return to work and on subsequent visits to the store suggest a mean-spirited intent to punish Appellee for her injury and the resulting claims made against Sheetz.

■ A corollary to the punishment objective of punitive damages awards is the goal of ensuring that such awards will serve to deter similar conduct. Sheetz stated at trial that it has changed its corporate policy to comport with the employment laws of this State.[28] While we doubt that Sheetz would risk being subjected to a large jury verdict again for conduct similar to that at issue here,[29] nonetheless, an appropriately sized punitive damages award may be necessary to ensure against repetition of both the conduct and policies employed by Sheetz in this case.

Another *Garnes* factor which requires consideration is the reprehensibility of the defendant's conduct. When reviewing this issue, the trial court identified various indicia of Sheetz' reprehensibility, which included failing to accommodate Appellee's work restrictions, failing to permit her to return to work absent complete recovery, discharging her, refusing to rehire her, paying its managers bonuses tied to reduced workers' compensation premiums, and failing to ac-

---

**28.** Sheetz asserts that it has amended its written policy to prevent the discharge of workers' compensation recipients and has altered its unwritten policy that formerly required workers to be "100%" before returning to work. Appellee counters that she has not seen a copy of this policy.

**29.** Sheetz claims to have been unaware of the West Virginia laws which it ultimately admitted to having violated. *See* W. Va.Code §§ 5–11–9; 23–5A–3.

knowledge its awareness of Appellee's work restrictions upon her return to work. The record in this case is replete with factual evidence of reprehensible conduct on the part of Sheetz sufficient to permit an award of punitive damages.

The trial court concluded that there are no civil or criminal penalties available for comparison purposes for the conduct at issue here. While this State does not provide for criminal penalties for violations of the Human Rights Act[30] or the Workers' Compensation Act, the Workers' Compensation Act expressly provides for a cause of action premised on violation of its anti-discrimination provisions. *See* W. Va.Code § 23–5A–2. That enabling section, however, does not establish a penalty limit that could be referred to for comparison purposes. Sheetz argues that the trial court should have considered the cap placed by Congress on the total amount of compensatory and punitive damages recoverable for intentional Title VII violations at $300,000. *See* 42 U.S.C. § 1981a(b)(3)(D) (1996); *see also Rush v. Scott Specialty Gases, Inc.*, 930 F.Supp. 194 (E.D.Pa.1996), *rev'd on other grounds*, 113 F.3d 476 (3rd Cir.1997) (comparing the $300,000 cap under federal law in remitting $3,000,000 punitive damages award to $300,000 in discrimination case that involved violations of both state and federal law). Because our Legislature has not established limits with regard to discrimination awards,[31] the trial court correctly concluded that it was without civil or criminal penalties for comparison purposes.

The additional *Garnes* factors considered by the trial court included the length of time Sheetz continued in its actions. Noting that Sheetz "continued upon its illegal course of conduct for nearly five years[,]" the trial court further observed that: "Not until opening statements did Sheetz, Inc. ever admit that their policies were illegal. Up until the first day of trial, Sheetz, Inc. denied any wrongdoing." The lower court also considered the complete absence of a fair and prompt settlement offer as well as the substantial costs[32] to Appellee in pursuing her claims against Sheetz. Additional review factors included the favorable financial position of Sheetz[33] and the appropriateness of a significant punitive damages award to discourage future bad acts as well as to encourage fair and reasonable settlements once a defendant is made aware of the fact that a clear wrong has been committed.

While we disagree with Sheetz' contention that *BMW* somehow altered the review factors previously identified in *Garnes*, we do wish to address this argument. While the *BMW* decision clearly delineates three "guideposts" for use in connection with the review of punitive damage awards, these so-called "guideposts" are merely reiterations of factors previously-adopted by both this Court and the United States Supreme Court. Contrary to Sheetz' position that *BMW* somehow alters this State's law on punitive damages review, each one of the "guideposts" was in fact applied by the trial court in its review of this case. Other than utilizing the "guidepost" terminology, *BMW* does not depart from existing law regarding punitive damages. Although *BMW* confines its analysis of the issue of notice to these three "guideposts"—a term that certainly suggests the possible use of additional factors—there is

---

**30.** It is, however, a misdemeanor to willfully interfere with the Human Rights Commission or to violate a Human Rights Commission order. *See* W. Va.Code § 5–11–14.

**31.** Through case law, this Court has established a limit on the amount of "incidental" damages that may be awarded by the West Virginia Human Rights Commission ("Commission") for humiliation, embarrassment, emotional and mental distress, and loss of personal dignity. In *Bishop Coal Co. v. Salyers*, 181 W.Va. 71, 380 S.E.2d 238 (1989), this Court set that figure at $2,500 with adjustments permitted only for inflation. The concern underlying the limitation was the defendant's constitutional right to a trial by jury for any higher awards. Because the action here was not before the Commission but before a circuit court and was in fact tried by a jury, the damages limitation discussed in *Salyers* is not applicable.

**32.** The trial court noted that Appellee's counsel had advanced over $3,000 in costs and incurred $50,000 in legal fees in connection with its representation of Appellee.

**33.** The trial court referenced evidence indicating that Sheetz had revenues of approximately $1,500,000 per day in 1994.

nothing in *BMW* that eliminates reference to previously-delineated factors that are not among the big three "guideposts." Proof of this point is gleaned from the section of the *BMW* opinion that discusses the second "guidepost." Although that particular "guidepost" is phrased in terms of the ratio between the plaintiff's compensatory damages and the amount of the punitive damages, the *BMW* opinion approvingly quotes its prior decision in *TXO* as stating "the proper inquiry" to be " ' "whether there is a reasonable relationship between the punitive damages award and *the harm likely to result* from the defendant's conduct as well as the harm that actually has occurred." ' " 517 U.S. at ——, 116 S.Ct. at 1602 (quoting *TXO*, 509 U.S. at 460, 113 S.Ct. at 2721–22 (emphasis in original), quoting *Haslip*, 499 U.S. at 21, 111 S.Ct. at 1045). Thus, the Supreme Court's own analysis in *BMW* demonstrates by its reference to an expanded concept of "the proper inquiry" necessary to a ratio comparison that the "guideposts" were not crafted for the purpose of replacing existing law on punitive damages nor were they intended to be viewed in a limiting fashion, as Sheetz suggests. *See Rush*, 930 F.Supp. at 201 (referring to *BMW*, *TXO*, and *Haslip* and noting "[o]ur reading of these three opinions reveals a *presumably non-exclusive* list of factors that combine to create a reasonable verdict") (emphasis supplied). Upon analysis, there is simply no basis for Sheetz' suggestion that *BMW* demands that punitive damages awards be reviewed differently from the fashion in which they are currently being reviewed under *Garnes* and its progeny.

■ Because the record in this case lacks evidence that Sheetz' conduct towards Appellee with regard to the unlawful termination/failure to rehire claims was prompted by malice or an intent to cause her specific harm and because the evidence on these claims similarly fails to demonstrate fraud, trickery, or deceit on Sheetz' part, we cannot uphold the punitive to compensatory ratio of seven to one under our ruling in syllabus point fifteen of *TXO*. *See* 187 W.Va. at 461,

419 S.E.2d at 874; *see also TXO*, 509 U.S. at 462, 113 S.Ct. at 2722–23 (upholding large punitive damages award, based in part, on employment of scheme involving "fraud, trickery and deceit"). Sheetz' conduct on these claims falls into a category of reckless disregard of Appellee's rights, rather than malice committed towards her. *See Rush*, 930 F.Supp. at 201. Under this Court's holding in syllabus point fifteen of *TXO*, we determine that the punitive damages award should be reduced by the amount of $466,260 so that a comparison of the punitive to the compensatory damages would result in a five to one ratio. 187 W.Va. at 461, 419 S.E.2d at 874. We find this result required by longstanding principles that mandate a reasonable relationship between the compensatory and punitive damages award.

■ We do not feel constrained to reduce the amount of the punitive damages awarded for the retaliation claim, however, despite the fifteen to one ratio,[34] due to the fact that the evidence introduced in connection with this claim crossed the line from reckless disregard of an individual's rights to willful, mean-spirited acts indicative of an intent to cause physical or emotional harm to Appellee in connection with her injury and resulting claims against Sheetz. As we stated in syllabus point fifteen of *TXO*, higher ratios between punitives and compensatories are permissible when the evidence suggests malevolence or actual intent to harm. *See* 187 W.Va. at 461, 419 S.E.2d at 874. The deceptiveness employed by Ms. Imler when feigning ignorance regarding Appellee's medical restrictions and Sheetz' continuing use of surveillance cameras on Appellee is sufficiently analagous to the area of "fraud, trickery, or deceit" recognized by the United States Supreme Court in *TXO* as deserving of larger awards of punitive damages. *See* 509 U.S. at 462, 113 S.Ct. at 2722–23. Given the trial court's exemplary employment of the *Garnes* factors to this case as discussed above, we are satisfied that the trial court properly engaged in the review required and that the facts of this case with regard to the

**34.** *See supra* note 26.

retaliation claim support upholding the fifteen to one ratio of punitive to compensatory damages without offending due process principles.[35]

■ The final matter which we address is Sheetz' request that this Court expand upon our recognition in *Mace v. Charleston Area Medical Center Foundation*, 188 W.Va. 57, 422 S.E.2d 624 (1992) and *Dzinglski v. Weirton Steel Corp.*, 191 W.Va. 278, 445 S.E.2d 219 (1994), that in those cases where emotional distress damages are sought and obtained without evidence of accompanying physical trauma, such awards "may assume the cloak of punitive damages." *Harless v. First Nat'l Bank*, 169 W.Va. 673, 690, 289 S.E.2d 692, 702 (1982). While the record in this case suggests that the evidence introduced regarding Appellee's suffering of emotional distress may indeed have been meager,[36] Sheetz agreed to the jury instruction on emotional distress damages and jointly submitted the verdict form which expressly allowed the jury to consider punitive and emotional distress damages. Accordingly, we decline to consider this issue when Sheetz did not raise the issue below for the trial court's consideration in the first instance. *See Sands*, 143 W.Va. at 522, 102 S.E.2d at 734, syl. pt. 2. We similarly refuse to address the issue of instructional error raised in the first instance on appeal when no objection was made below.[37] *See Horan v. Turnpike Ford, Inc.*, 189 W.Va. 621, 626, 433 S.E.2d 559, 564 (1993) (stating that " 'party may only assign error to the giving of instructions if he objects thereto before arguments to the jury are begun stating distinctly the matter to which he objects and the grounds of his objection' ") (quoting Syl. Pt. 1, *Roberts v. Powell*, 157 W.Va. 199, 207 S.E.2d 123 (1973)).

Based on the foregoing, this matter is reversed, in part, and remanded to the Circuit Court of Berkeley County for entry of an order consistent with this opinion.

Reversed, in part, and remanded.

MAYNARD, J., dissents and files a dissenting opinion.

MAYNARD, Justice, dissenting:

Cheryl Vandevender was essentially out of work for four weeks. She also suffered other minor mistreatment. For this, she received $123,866 in compensatory damages, $170,000 for noneconomic damages, and almost 2.7 million dollars in punitive damages! The total verdict was a few dollars shy of *three million dollars!* In the majority opinion, this Court upholds over 2-1/2 million dollars of that verdict, including the outrageous sum of $2,232,740 in punitive damages. I strongly dissent because I believe that punitive damages are not recoverable for West Virginia Human Rights Act and Workers' Compensation Act violations.

The majority declines to address the issue of whether the Human Rights Act and Workers' Compensation Act violations provide for .

---

**35.** Although we treated the claims separately, the trial court, in its review, grouped the claims and the damages awarded together, resulting in a 9:1 ratio.

**36.** The only testimony Appellee offered regarding emotional distress in connection with the reprisal allegation was that the March 1993 letter from Sheetz made her feel "real bad." Her son testified additionally that his mother was very upset by Sheetz' treatment of her. Appellee did not introduce any evidence of psychiatric or psychological treatment nor any medical testimony of related trauma to support her claim for emotional distress.

**37.** Sheetz asserts on appeal that the punitive damage instruction given was in error for failure to include language concerning the requirement

noted in *Harless* II that the "plaintiff must prove *further egregious conduct* on the part of the employer[]" to be entitled to punitive damages, rather than just the act of retaliatory discharge. 169 W.Va. at 692, 289 S.E.2d at 703 (emphasis supplied). Sheetz admits that it failed to object to the form of the punitive damages instruction, but invites this Court to find error under the plain error doctrine. *See* syl. pt. 4, *Voelker v. Frederick Business Properties Co.* 195 W.Va. 246, 465 S.E.2d 246 (1995). We decline to address this assignment under the plain error rule. *See Maples v. West Virginia Dep't of Commerce*, 197 W.Va. 318, 323–24, 475 S.E.2d 410, 415 (1996) (discussing effect of waiver of right to review on plain error doctrine).

punitive damages because the appellant failed to raise this issue below. However, because it is clear that these acts do not specifically authorize punitive damage awards and our case law indicates that punitive damages are not an element of damages under the Human Rights Act, I believe that the circuit court was totally without the jurisdiction to order such an award.

In addition to an order of reinstatement and back pay, the Human Rights Act provides that a court may order "other legal and equitable relief as the court deems appropriate" for violations of Human Rights Act discrimination provisions. W.Va.Code § 5–11–13(c). Although the Workers' Compensation Act does not address the relief available for workers' compensation discrimination, I believe that it would not differ from the relief available under the Human Rights Act. According to *Dobson v. Eastern Associated Coal Corp.*, 188 W.Va. 17, 24, 422 S.E.2d 494, 501 (1992), "other legal and equitable relief" means that a plaintiff bringing a discrimination claim may generally recover damages available in tort. In *Harmon v. Higgins*, 188 W.Va. 709, 711, 426 S.E.2d 344, 346 (1992), however, this Court noted that the trial court had treated the sexual harassment case as a *Harless*[1] action and not as a Human Rights Action, and stated that "punitive damages ... are allowed in a *Harless*-type case but are not an element of damages under the Human Rights Act. In *Guevara v. K–Mart Corp.*, 629 F.Supp. 1189, 1190–91 (S.D.W.Va. 1986), Judge Haden noted that the case was pled as a *Harless* action rather than under the Human Rights Act, and stated that the plaintiff's "requested elements of damage are more extensive than those available under the [Human Rights Act]. For example, she seeks an award of punitive damages equal to the claimed amount of compensatory damages." This Court should be consistent in its statements of the law and hold here that

punitive damage awards are not applicable under the Human Rights Act and the Workers' Compensation Act. Based upon the absence of a clear legislative statement that punitive damages are recoverable and the language in the cases cited above, I believe that punitive damages are not recoverable in this case.

It is clear that the appellee was treated badly by the appellant, and that the appellant should have to pay her a fair amount of damages. However, the operative word here is "fair." The appellee was awarded $293,866.00 in compensatory and noneconomic damages for missing essentially four weeks of work and for the appellant's other mistreatment of her, and I do not believe that this was improper, and it seems fair. But even if a punitive damages award were authorized here, an award of $2,232,740 is simply too much under the facts of this case. The task of determining what constitutes an excessive punitive damages award, in light of due process guarantees, is extremely difficult, and not given to bright line rules. Admittedly, I do not have all the answers in making such a determination, and frankly, I can't presently state what the terms of a good rule should be. I am reminded, however, of United State Supreme Court Justice Potter Stewart's comment that although he could not define hard-core pornography, "I know it when I see it."[2] Likewise, I know an excessive punitive damages award when I see one, and I see one here. I would call this one hard-core. Therefore, I dissent.

---

**1.** *Harless v. First National Bank in Fairmont*, 162 W.Va. 116, 124, 246 S.E.2d 270, 275 (1978) where this court explained that "[w]here the employer's motivation for the discharge contravenes some substantial public policy principle, then the employer may be liable to the employee

for damages occasioned by the discharge." (footnote omitted).

**2.** *Jacobellis v. Ohio*, 378 U.S. 184, 197, 84 S.Ct. 1676, 1683, 12 L.Ed.2d 793, 804 (1964) (Justice Stewart concurring).