536 S.E.2d 127

**Antoinette CUPANO, Plaintiff Below, Appellant,**

v.

**WEST VIRGINIA INSURANCE GUARANTY ASSOCIATION, Defendant Below, Appellee.**

No. 26650.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 16, 2000.

Decided June 14, 2000.

Dissenting Opinion of Justice Starcher June 28, 2000.

D. Michael Burke, Esq., Burke & Schultz, Martinsburg, West Virginia, Attorney for Appellant.

Cheryl Lynne Connelly, Campbell, Woods, Bagley, Emerson, McNeer & Herndon, Huntington, West Virginia, Attorney for Appellee.

MAYNARD, Chief Justice:

This appeal arises from an order of the Circuit Court of Berkeley County granting a motion for summary judgment to the appellee, West Virginia Insurance Guaranty Association, against the appellant, Antoinette Cupano. The appellant alleges in this appeal that the circuit court erred in finding that she cannot stack her underinsured motorist coverages.

## I.

### FACTS

The facts of this case are not in dispute. On June 22, 1995, the appellant and plaintiff below, Antoinette Cupano was a passenger in a vehicle operated by her mother, Mary Ann Cupano, and owned by her father, Vincent J. Cupano, Jr. (hereinafter "the Cupanos"). The vehicle driven by Mary Ann Cupano was struck by another vehicle driven by Stacey C. Miller. As a result of the accident, the appellant sustained injuries to her right knee and ankle.

At the time of the accident, the Cupanos possessed an assigned risk personal automobile insurance policy issued by the Coronet Insurance Company (hereinafter "Coronet") with effective dates of July 20, 1994 to July 20, 1995. The policy covered two vehicles, a 1977 Chevrolet and a 1989 Oldsmobile. In pertinent part, the Cupanos' policy provided:

**LIMIT OF LIABILITY**

A. With respect to the Uninsured Motorists Coverage/Underinsured Motorist Coverage indicated as applicable in the Schedule or in the Declarations for damages caused by an accident with an "uninsured motor vehicle" or "underinsured motor vehicle" respectively:

1. The limit of Bodily Injury Liability shown for each person is our maximum limit of liability for all damages, including damages for care, loss of services or death, arising out of "bodily injury" sustained by any one person in any one accident.

\* \* \*

The limits of liability applicable to Uninsured Motorists Coverage and Underinsured Motorists Coverage are the most we will pay regardless of the number of:

1. "insureds";

2. Claims made;

3. Vehicles or premiums shown in the Schedule or the Declarations; or

4. Vehicles involved in the accident.

The Cupanos received a 10% multi-car discount per vehicle on the bodily injury liability coverage, the property damage liability coverage, and the medical payments liability coverage.[1] As a result of these discounts, the premium paid by the Cupanos on the policy was reduced from $1574.68 to $1429.00, which is a discount on the entire policy of $145.68.[2] The Cupanos did not receive a 10% multi-car discount on the underinsured motorists coverage. The Underinsured Motorists Coverage Offer (Form A) states that "Rates [ ] include [x] do not include multi-car discount."[3] The policy provided underinsured motorists bodily injury coverage in the amount of $25,000 per person and $50,000 per accident on each vehicle covered.

At the time of the accident, Stacey C. Miller was insured under a policy by Nationwide Mutual Insurance Company which carried liability limits of $100,000 per person and $300,000 per accident. Nationwide entered into settlement negotiations with the appellant and offered its full coverage limit of $100,000. After Coronet waived its subrogation rights, the Nationwide settlement was concluded.

The appellant also asserted an underinsured motorist claim under the policy issued to the Cupanos by Coronet, in which she contended that she was entitled to stack the underinsured motorist coverage for each ve-

1. This discount is reflected in a code appearing on the declarations page, in the premium charged, and in the manual verification of the rating. Also, the West Virginia Insurance Guaranty Association submitted the affidavit of Pam Baudouin, the business analyst for Policy Management Systems Corporation, which states that the declarations page of the Cupanos' policy shows that a 10% multi-car discount was given on the policy.

2. In its Order Denying Plaintiff's Motion To Amend Or Alter Judgment, the circuit court states that the Cupanos saved $144.68 on the total premium paid on the single multi-vehicle policy. As noted above, however, this Court's calculation results in a total premium of $145.68. This discrepancy is irrelevant to the disposition of this case.

3. Specifically, according to the West Virginia Automobile Insurance Plan Manual Private Passenger Auto Rating Worksheet attached as "Exhibit A" to the Response of the West Virginia Insur-

ance Guaranty Association, the bodily injury liability premium for each vehicle was a base rate of $404.00 multiplied by an increased limits factor amount of 1.16 for a premium of $468.64. The 10% multi-car discount reduced this premium to $422.00. The property damage liability premium for each vehicle was a base rate of $204.00 multiplied by an increased limits factor amount of 1.05 for a premium of $214.20. The 10% multi-car discount reduced this premium to $193.00. The medical payments base premium for each vehicle was $54.00. The 10% multi-car discount reduced this premium to $49.00. The uninsured motorists coverage base premium was $44.00 on the first vehicle plus an increased limits factor of $6.00 for a premium of $50.00. The uninsured motorists coverage base premium was $36.00 on the second vehicle plus an increased limits factor of $5.00 for a premium of $41.00. Finally, underinsured motorists coverage for each vehicle was $5.00. Therefore, the total premium amounted to $1574.68. With the 10% discount, the total premium was $1429.00. The difference was a savings of $145.68.

hicle with a resulting limit of $50,000.[4] Relying upon its anti-stacking language and multi-car premium discount, Coronet responded that its underinsured motorists coverage was limited to $25,000 which it offered to the appellant.

Coronet was subsequently declared to be insolvent, and the defendant below and appellee herein, the West Virginia Insurance Guaranty Association, (hereinafter "the Association") succeeded to and became liable, by operation of W.Va.Code § 33-26-1 *et seq.* for covered claims existing against Coronet.[5] The Association paid the appellant $24,900, the underinsured motorists limit for one vehicle under the Coronet policy, less the statutory $100 deductible.[6]

On May 8, 1998, the appellant brought an action against the Association in which she sought to collect an additional $25,000 as the bodily injury limit of the underinsured motorists coverage on the second vehicle under the Cupanos' policy. By order of November 30, 1998, the circuit court denied the appellant's motion for summary judgment and granted the Association's cross motion for summary judgment. The circuit court found that the Cupanos' policy contained a valid anti-stacking provision and the Cupanos received a multi-car discount on the total policy premium. By order of January 27, 1999, the circuit court denied the appellant's motion to amend or alter the judgment.

## II.

### STANDARD OF REVIEW

We begin our discussion by setting out the standard of review of an order granting summary judgment. In Syllabus Point 1 of *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994), we stated that "[a] circuit court's entry of summary judgment is reviewed *de novo*." Also, "[a] motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syllabus Point 3, *Aetna Casualty & Surety Co. v. Federal Ins. Co. of N.Y.*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

Also, in this case we are asked to determine the proper coverage of an insurance contract. We have stated that "[d]etermination of the proper coverage of an insurance contract when the facts are not in dispute is a question of law." *Mitchell v. Federal Kemper Ins. Co.*, 204 W.Va. 543, 544, 514 S.E.2d 393, 394 (1998), *citing Pacific Indemnity Co. v. Linn*, 766 F.2d 754, 760 (3rd Cir.1985). With this in mind, we now consider the issues raised by the appellant.

## III.

### DISCUSSION

Both parties agree that the disposition of this case is controlled by Syllabus Point 4 of *Miller v. Lemon*, 194 W.Va. 129, 459 S.E.2d 406 (1995), in which this Court stated:

> Anti-stacking language in an automobile insurance policy is valid and enforceable as to uninsured and underinsured motorist

4. The stacking of insurance coverage in this context means multiplying the amount of underinsurance coverage for bodily injury per vehicle covered by the policy.

5. W.Va.Code §§ 33-26-1 through 33-26-19 are known collectively as the West Virginia Insurance Guaranty Association Act. W.Va.Code § 33-26-2 (1970) provides:
   The purpose of this article is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer, to assist in the detection and prevention of insurer insolvencies, and to provide an association to assess the cost of such protection among insurers.

W.Va.Code § 33-26-6 (1970) creates the West Virginia Insurance Guaranty Association as a nonprofit unincorporated legal entity. According to W.Va.Code § 33-26-8(1)(b) (1985), the Association is "deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, defenses and obligations of the insolvent insurer as if the insurer had not become insolvent."

6. There is no dispute in this case that the Association became responsible by law for the payment of the appellant's covered claims against Coronet or that the appellant was a "covered person" under her parents' policy at the time of the accident.

coverage where the insured purchases a single insurance policy to cover two or more vehicles and receives a multi-car discount on the total policy premium. If no multi-car discount for uninsured or underinsured motorist coverage is apparent on the declarations page of the policy, the parties must either agree or the court must find that such a discount was given. In such event, the insured is not entitled to stack the coverages of the multiple vehicles and may only recover up to the policy limits set forth in the single policy endorsement.

In *Miller*, the plaintiffs purchased a single insurance policy for coverage of two vehicles, a 1977 Ford Mustang and a 1988 Oldsmobile Delta Eighty-eight. The policy contained unambiguous anti-stacking language. The plaintiffs' previous insurance policy covered only the 1977 Ford Mustang, and the total policy premium was $136. Specifically, under the previous policy, the plaintiffs paid $122 for bodily injury liability coverage; $6 for medical payments coverage; $7 for uninsured motorists bodily injury coverage; and $1 for uninsured motorists property damage coverage.[7] Premiums paid on the subsequent single multi-vehicle policy were $94 for bodily injury liability coverage; $5 for medical payments coverage; $7 for uninsured motorists bodily injury coverage; and $1 for uninsured motorists property damage coverage. Thus, the plaintiffs received a multi-car discount of $28 on each vehicle for bodily injury liability coverage and $1 on each vehicle for medical payments coverage, for a total premium discount on the entire policy of $58.

The plaintiffs maintained, however, that because they received no discount specifically for uninsured motorist coverage, the anti-stacking provision was ineffective as to that coverage. This Court disagreed, and explained:

Having contracted for only one policy of insurance, the Millers likewise bargained for only one uninsured motorist coverage endorsement. In return, Federal Kemper "assum[ed] an increased risk. of injury which could occur while [the Millers were] occupying the second vehicle as consider-

ation for the second premium. [The Millers were] therefore receiving the benefit of that which [they] bargained for and should not receive more."

*Miller*, 194 W.Va. at 133, 459 S.E.2d at 410, quoting *Russell v. State Auto. Mut. Insurance Co.*, 188 W.Va. 81, 85, 422 S.E.2d 803, 807 (1992). (Additional citation omitted).

■ In the instant case, there is no contention that the Cupanos' policy does not contain valid anti-stacking language. Also, it is undisputed that the Cupanos' policy is a single insurance policy which covers two vehicles. Accordingly, the dispositive issue in this case is whether the Cupanos received "a multi-car discount on the total policy premium" as required by syllabus point 4 of *Miller*.

As noted above, the circuit court found that the 10% multi-car discounts on the premiums charged for bodily injury liability, property damage liability, and medical payments coverages constitute a discount on the total policy premium. The appellant maintains, to the contrary, that multi-car discounts on some, but not all, coverages contained in a single insurance policy constitute a discount on only a partial policy premium and not the total policy premium. According to the appellant, a multi-car discount on the total policy premium can be shown in either of two ways. First, a discount applied individually to the premiums charged for each separate coverage contained in a policy constitutes a discount on the total policy premium. The appellant concedes, however, that the validity of anti-stacking language is not contingent upon the presence of a specific multi-car discount applied to the premium paid for underinsured motorists coverage. Accordingly, the appellant avers that a multi-car discount on the total policy premium also includes a discount applied to the aggregate of premiums charged on all coverages contained in the insurance policy. In other words, the multi-car discount must be subtracted from the total policy premium once it is calculated by adding together the premiums on each separate coverage contained within the policy.

**7.** *See Miller,* footnote 2.

The appellant recognizes that the insurance policy at issue in *Miller* did not include a multi-car discount on the premium charged for uninsured coverage. The appellant distinguishes *Miller* from the case *sub judice*, however, by noting that in the instant case a multi-car discount is expressly exempted for underinsured coverage whereas in *Miller* there was no such specific exemption. The appellant also opines that it is unfair to prevent her from stacking underinsurance coverage because her parents did not receive a multi-car discount on the premium charged for such coverage. We disagree.

■ The appellant's argument essentially hinges on the words "total policy premium" contained in syllabus point 4 of *Miller*. The appellant, however, urges us to define these words in a way that is not in accord with the facts of *Miller*. "[T]he statement contained in a syllabus is to be read in the light of the opinion." *Jones v. Jones,* 133 W.Va. 306, 310, 58 S.E.2d 857, 859 (1949), *citing Koblegard, Trustee v. Hale,* 60 W.Va. 37, 41, 53 S.E. 793, [794] [1906]. *See also State v. Franklin,* 139 W.Va. 43, 79 S.E.2d 692 (1953). We believe it is clear from the facts of *Miller* that an anti-stacking provision is valid as to underinsurance coverage even though no multi-car discount applies specifically to that coverage. We also believe it is clear from *Miller* that in order to show a multi-car discount on the total policy premium, one does not have to show that the discount was applied to the aggregate of all the premiums on all the separate coverages included in the policy.

As set forth previously, the facts of *Miller* show that the plaintiffs, by purchasing a single multi-vehicle insurance policy, received a discount in premiums for bodily injury liability coverage of $28 per vehicle and a discount in premiums for medical payments coverage of $1 per vehicle. No multi-car discount was applied to premiums for uninsured motorists bodily injury and property damage coverages. Also, there is no evidence that the multi-car discounts applied to

the plaintiffs' single multi-vehicle policy were deducted from the aggregate of all the premiums of the various coverages. Rather, the multi-car discount was deducted from specific coverages contained in the policy, i.e., bodily injury liability coverage and medical payments coverage. In *Miller,* this Court considered these discounts to constitute a multi-car discount on the total policy premium.

■ Therefore, reading syllabus point 4 of *Miller* in light of its facts, we conclude that it stands for the proposition that anti-stacking language in an automobile insurance policy is valid and enforceable as to uninsured and underinsured motorist coverages where the insured purchases a single insurance policy to cover two or more vehicles and receives a multi-car discount on at least one of the coverages included in the policy so that the insured pays less for his or her single multi-vehicle insurance policy than if a separate insurance policy for each vehicle had been purchased.[8]

In the present case, the Cupanos paid a total of $1,429.00 for their single multi-vehicle policy rather than the $1,574.68 they would have paid for separate policies for each vehicle. This is a discount of $145.68. We believe that the fact that the whole dollar premium was not added up without the discount and then the discount deducted from the total is irrelevant. Further, we find no relevance in the fact that the Cupanos' underinsured coverage specifically exempted a multi-car discount. The Cupanos received the benefit of their bargain by insuring two vehicles under one policy and thereby saving $145.68. Therefore, in accordance with *Miller,* the appellant is not entitled to stack the underinsured motorist coverage.

■ Finally, the appellant avers that Coronet failed to follow its own rating guideline in the West Virginia Automobile Insurance Plan Manual in charging undiscounted premiums for underinsured coverage. As a result, says the appellant, she is contractually entitled to stack underinsured coverage. The Association responds that the appellant

---

**8.** We note that the Cupanos did receive a discount on the uninsured motorists coverage apparently because they purchased a multi-vehicle policy. The premium for uninsured motorists coverage on the first vehicle was $50.00 while the premium for coverage on the second vehicle was $41.00.

failed to raise this issue below. Our review of the record confirms a failure to preserve this issue for appeal. We have stated many times that "[t]his Court will not pass on a nonjurisdictional question which has not been decided by the trial court in the first instance." Syllabus Point 2, *Sands v. Security Trust Co.*, 143 W.Va. 522, 102 S.E.2d 733 (1958). *See also Vandevender v. Sheetz, Inc.*, 200 W.Va. 591, 490 S.E.2d 678 (1997), *cert. denied*, 522 U.S. 1091, 118 S.Ct. 883, 139 L.Ed.2d 871 (1998). Accordingly, we decline to address this issue for the first time on appeal.

### IV.

### CONCLUSION

For the reasons stated above, we conclude that the Cupanos received a multi-car discount on the total policy premium of their single, multi-vehicle automobile insurance policy. Therefore, according to syllabus point 4 of *Miller v. Lemon, supra*, the anti-stacking language contained in the policy is valid and enforceable. Accordingly, the circuit court's grant of summary judgment on behalf of the West Virginia Insurance Guaranty Association is affirmed.

Affirmed.

Justice McGRAW dissents.

STARCHER, Justice, dissenting:

(Filed June 28, 2000)

Everyone knows what it means to "bargain": two parties interact and reach an agreement on the terms of a transaction. By "agreement," everyone comprehends that both sides have reached a mutual understanding.

I dissent because Syllabus Point 2 of the majority opinion throws these basic rules of contract law to the wind. Applying the majority's reasoning, as long as one party to an insurance contract understands the terms of the agreement, it is irrelevant what the other side understands. The agreement can be unilateral by the insurance company; it need not be mutual.

The insurance company in this case sold the policyholders a policy which plainly, unequivocally said: "Rates ... do not include multi-car discount." If the insurance company says there was no multi-car discount, then the plaintiff obviously could not have known about a multi-car discount. If they did not know, they could not have agreed to the discount. And if they did not even agree on the discount that was not noted on the declarations page on the cover of the policy, how in the world could they have agreed to the anti-stacking exclusion buried inside the policy?

I also dissent because the majority opinion chose not to apply, for reasons not discussed, our recent holding in *Mitchell v. Broadnax*, 208 W.Va. 36, 537 S.E.2d 882 (2000). In *Mitchell*, this Court applied several insurance statutes enacted by the Legislature, and held that when an insurance company relies upon an exclusion in an insurance policy to avoid providing coverage, then the insurance company bears the burden of proving (1) that it adjusted the policy premium so that the premium was consistent with the amount of coverage; and (2) that the premium adjustment and the exclusion were plainly communicated to the policyholder. Neither one of these requirements was met in this case.

It is well-settled law that an insurance company may include an "anti-stacking" exclusion in an automobile insurance policy pursuant to *W.Va.Code*, 33–6–31(k) [1995]. *See Russell v. State Auto Mut. Ins. Co.*, 188 W.Va. 81, 422 S.E.2d 803 (1992). As we said in *Miller v. Lemon*, 194 W.Va. 129, 459 S.E.2d 406 (1995), when a policyholder buys a single policy to cover two or more vehicles, and as part of the "bargain" with the insurance company gets a multi-car discount on the premiums, then any "anti-stacking" exclusion in the policy can be enforceable. The Court's thinking in *Miller v. Lemon* was that, in theory, the policyholder and insurance company had reached an arms-length agreement: in return for lower premiums on two vehicles, the policyholder agreed to lower coverage through the operation of the anti-stacking exclusion.

The key to enforcing an anti-stacking exclusion is that the policyholder must have

somehow known about and agreed to the exclusion, and at a minimum, known about and agreed to the reduced premiums. The policyholder must learn about the reduced premium and reduced coverage before a loss occurs—otherwise, how can there be an agreement on the policy terms? In explaining how courts are to apply *W.Va.Code*, 33-6-31(k) to an exclusion such as an anti-stacking one, this Court stated, at Syllabus Point 5 of *Mitchell*, that:

> When an insurer incorporates, into a policy of motor vehicle insurance, an exclusion pursuant to *W.Va.Code* § 33-6-31(k) (1995)(Repl.Vol.1996), the insurer must adjust the corresponding policy premium so that the exclusion is "consistent with the premium charged."

Additionally, citing to our seminal case adopting the doctrine of reasonable expectations, we stated at Syllabus Point 8:

> "An insurer wishing to avoid liability on a policy purporting to give general or comprehensive coverage must make exclusionary clauses conspicuous, plain, and clear, placing them in such a fashion as to make obvious their relationship to other policy terms, and must bring such provisions to the attention of the insured." Syllabus point 10, *National Mutual Insurance Co. v. McMahon & Sons, Inc.*, 177 W.Va. 734, 356 S.E.2d 488 (1987).

In the instant case, the West Virginia Insurance Guaranty Association—after the loss occurred, during the course of litigation—showed up in place of the insurance company and did some math based upon the West Virginia Automobile Insurance Plan Manual Private Passenger Auto Rating Worksheet. I am at a loss what this manual has to do with this case, since its pretty clear that the policyholders never got a copy, and therefore couldn't have relied upon it to calculate their own premiums.

Anyway, the Association submitted an affidavit indicating that, even though they didn't know it, the policyholders had received a multi-car discount on their various policies, and that because of this adjustment to the policy premiums, the policyholders had "bargained" for the anti-stacking language in their automobile insurance policies. We

made clear in *Mitchell*, however, that such an "after-the-fact" affidavit showing a premium adjustment, an affidavit that magically appears during the course of a lawsuit well after a policyholder has made a claim, is insufficient alone to support the enforceability of a policy exclusion.

Our uninsured motorist statutes require that the policyholder be told, up front, when they are buying the policy, in conspicuous, plain, clear language, that their premiums have been adjusted to reflect an exclusion or other condition in a policy. There was no evidence in the record of this case that the policyholders were ever told they received a "multi-car discount" in return for their "agreeing" to the anti-stacking language in the policy. There was certainly no evidence to even show he was told about the existence of the anti-stacking language, or any evidence that its effect on his coverage was explained to him. As we said repeatedly in *Mitchell*, state law prohibits an insurance company from including in a policy "exceptions or conditions which deceptively affect the risk purported to be assumed in the general coverage of the contract"—and an exclusion is deceptive when its existence and effect is not explained to a policyholder.

In sum, there was no bargaining going on between the policyholders and the insurance company in this case. There was certainly no evidence that the premium charged was consistent with the anti-stacking exclusion, as is required by *W.Va.Code*, 33-6-31(k). The insurance company surprised the policyholders, and told them they didn't buy what they thought they were buying long after it took—and kept—their money. The Legislature did not intend such a patently unfair result when it enacted *W.Va.Code*, 33-6-31(k).

I would have reversed the circuit court's order and remanded the case for further hearings pursuant to longstanding contract law principles and our holding in *Mitchell*. I therefore respectfully dissent.